THE STATE OF OHIO, APPELLEE, *v.* COOEY, APPELLANT.

[Cite as State *v.* Cooey (1989), 46 Ohio St. 3d 20.]

(No. 88-351—Submitted June 6, 1989—Decided October 11, 1989.)

*Lynn Slaby,* prosecuting attorney, and *Marc R. Wolff,* for appellee.

*Randall M. Dana,* public defender, *S. Adele Shank* and *Stephen P. Deffet,* for appellant.

MOYER, C.J.   Cooey advances thirty-three propositions of law in this appeal. For the reasons set forth below, we affirm the convictions and sentence of death.

## I

Our analysis begins with those issues primarily affecting the convictions.

## A

Cooey's nineteenth proposition of law is divided into nine parts in which he attacks the sufficiency of the evidence adduced to prove each count of the indictment (except those charging aggravated robbery) and each specification.

Cooey argues that the state failed to prove the prior calculation and design necessary to obtain convictions for aggravated murder under R.C. 2903.01(A). He claims that the murders were "conceived and executed on the spur of the moment[,]"

see Committee Comment to R.C. 2903.01, when Cooey used Clint Dickens' name in front of the victims.

We reject this contention. Cooey said in his taped confession that he addressed Dickens by name "in the middle of when I was with Wendy * * *." Cooey stated that *after* he was finished with Wendy, "the two girls got back in the car, [while] me and Clint was outside talking." During this conversation, Dickens told Cooey "that they knew his name. And then he said that he had to knock them off." The women then got out of the car, at which point Cooey began to choke Wendy. This sequence of events, especially in light of the use of strangulation and repeated bludgeoning to kill the victims, supports a finding that Cooey engaged in more than momentary deliberation.

In any case, Cooey was not sentenced on the counts charging murder with prior calculation and design, since these were merged into the felony murder counts.

Cooey argues that his felony murder convictions under R.C. 2903. 01(B) must be reversed because the state failed to prove that the murders were committed at precisely the same time as the rapes or kidnappings. He points to the statutory language providing: "No person shall purposely cause the death of another while committing * * * kidnapping, rape * * * [or] aggravated robbery * * *." (Emphasis added.) According to Cooey, "while" means "simultaneously with."

Construing the same provision in *State* v. *Cooper* (1977), 52 Ohio St. 2d 163, 6 O.O. 3d 377, 370 N.E. 2d 725, vacated on other grounds (1978), 438 U.S. 911, we said: "The term 'while' does not indicate * * * that the killing must occur at the same instant as the attempted rape, or that the killing must have been caused by the attempt, but, rather, indicates that the killing must be directly associated with the attempted rape as part of one continuous occurrence, a situation present in the instant cause. * * *" *Id.* at 179-180, 6 O.O. 3d at 386, 370 N.E. 2d at 736. The evidence here showed that the murders were associated with the kidnappings, robbery, and rapes "as part of one continuous occurrence. * * *"

Cooey argues that the state failed to prove that he raped Wendy or Dawn. Initially, we note that the four counts of rape alleged in the indictments cited R.C. 2907.02(A)(1), which deals with non-forcible types of rape. This leads Cooey to argue that his convictions on these counts should be reversed because the state failed to prove the elements of rape under R.C. 2907.02(A)(1).

This argument overlooks the actual language of the rape counts. Each count alleged that Cooey "purposely compelled * * * [his victims] to submit by force or threat of force * * *." Thus, Cooey was charged with violating R.C. 2907.02(A)(2) (forcible rape), and the state was not required to prove that he violated R.C. 2907.02(A)(1). Nor does Cooey complain that he was misled at trial by the erroneous numerical designation of the statute he was charged with violating. Thus, the error cannot be grounds for reversal. See Crim. R. 7(B).

Cooey's next argument concerning the rape charges is hardly more substantial. He admitted in his confession that he had oral and vaginal intercourse with Wendy, but claimed throughout that she not only consented to this, but offered herself to him. He argues that the state introduced no evidence to disprove this claim or to prove the use of force.

However, the circumstances make Cooey's story appear highly unlikely. Cooey's own confession shows that, when Dawn and Wendy asked where

Cooey was taking them, he ordered them to "shut up" and gave Dickens a knife to threaten them with; that the women asked their captors not to hurt them; and that Dickens raped Wendy. Yet, Cooey claims that after being kidnapped, threatened with a knife, and raped by Dickens, Wendy sat on Cooey's lap, rubbed his genital area, and invited him to have sex with her. This account is patently unreasonable. Viewing the evidence, as we must, in the light most favorable to the state, the circumstances are sufficient to show that Cooey compelled Wendy to submit by threat of force.

We also find sufficient the evidence that Cooey raped Dawn McCreery. While he never admitted to having sex with her, he did admit that he lay on top of her while both were nude. The coroner concluded to a reasonable medical certainty, based on physical evidence, that there had been sexual activity involving the inside of Dawn's mouth and vagina. We believe that a reasonable trier of fact could have convicted Cooey of rape on this evidence.

While Cooey concedes that he kidnapped Wendy and Dawn, he argues that the state did not prove he did so for the purpose of engaging in sexual activity with them against their will as required for conviction under R.C. 2905.01(A)(4). He argues that "the only asportation of the women was done in the course of and in furtherance of the robbery." He further points out that any restraint merely incidental to the rapes cannot support convictions of both kidnapping and rape. *State* v. *Logan* (1979), 60 Ohio St. 2d 126, 14 O.O. 3d 373, 397 N.E. 2d 1345.

However, the sequence of events suggests that robbery was not Cooey's only purpose in kidnapping the women. Dawn was robbed of her purse during the drive, but Cooey did not release her after the robbery. When they arrived at their destination, Cooey and Dickens raped Dawn and Wendy, then killed them. It was not until after the women were dead that they stole Wendy's jewelry. The evidence supports Cooey's conviction of kidnapping for the purpose of engaging in sexual activity with his victims against their will.

Even if the asportation did not support the convictions, the restraint following the asportation was both prolonged and secretive, as Wendy and Dawn were taken to a "nontrafficked area." *Logan, supra,* at 135, 14 O.O. 3d at 378, 397 N.E. 2d at 1351. On these facts, the restraint was more than merely incidental to the rapes.

Each of the four aggravated murder counts carried three identical capital specifications. Cooey argues that the state proved none of them.

Specification One charged "that the offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another crime * * * committed by the offender." Cooey told police that he took part in the murders because the women had heard him call Dickens "Clint." He argues that he killed, not to escape detection, apprehension, trial, or punishment for his own crimes, but so that Dickens could escape.

We think it implausible to suggest that Cooey's concern for Dickens was purely altruistic. Obviously, if Dickens' identity were known, he might lead the police to Cooey.

Indeed, once Cooey was caught, his concern for Dickens ended. Cooey freely implicated Dickens in the murders and guided police to Dickens' house. Thus, we agree that the trier of fact could have concluded beyond a reasonable doubt that Cooey killed

because of the possible consequences *to himself* of the victims' knowing Dickens' name.

Specification Two alleged that the murders were "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons * * *." Cooey claims that he did not attempt to kill both women. While he admitted that he choked Wendy, he denied bludgeoning or strangling Dawn.

However, as Cooey concedes, David Jones and Terry Grant testified to the contrary. The triers of fact believed this testimony, and we refuse to second-guess their evaluation of credibility.

Cooey argues that the state failed to prove Specification Three, which charged him with committing the murders "while" committing, attempting, or fleeing after the commission or attempted commission of rape, kidnapping, and/or aggravated robbery. Again, he argues that "while" means "simultaneously with." We reject this on the authority of *State* v. *Cooper, supra.*

He further argues that Specification Three was not proved because the state proved neither that he was the principal offender nor that he harbored prior calculation and design. We have rejected, *supra,* the argument that Cooey lacked prior calculation and design. Moreover, the testimony of Grant and Jones shows that Cooey beat both women, and Cooey's confession shows that he choked Wendy. This evidence clearly supports a finding that Cooey was a principal offender.

Finally, Cooey argues that he was not guilty of felonious assault under R.C. 2903.11(A)(2). First, he argues that it was Dickens, not he, who dropped the chunk of concrete on Wendy's car. However, under R.C. 2923.03(A)(2), Cooey was guilty of complicity in felonious assault — and therefore of the assault itself under R.C. 2923.03(F) — if dropping the chunk of concrete was a felonious assault and if, acting with the kind of culpability needed for felonious assault, he aided or abetted Dickens in doing so.

"* * * To abet is to incite or encourage." *State* v. *Sims* (1983), 10 Ohio App. 3d 56, 58, 10 OBR 65, 68, 460 N.E. 2d 672, 675. Cooey admitted throwing objects off the bridge along with his companions. It can be reasonably inferred that, by taking part, Cooey encouraged Dickens to continue throwing things off the bridge. This evidence is sufficient to support a finding beyond a reasonable doubt that Cooey abetted Dickens' dropping the chunk of concrete, and was thus criminally liable as an abettor.

Second, Cooey argues that there was no evidence that the purpose of dropping the chunk was to cause physical harm to another. However, the culpable mental state required for a felonious assault conviction under R.C. 2903.11(A)(2) is not purpose, but knowledge. R.C. 2901.22(B) provides: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. * * *"

The trier of fact could have found beyond a reasonable doubt that Cooey knew dropping a large chunk of concrete from the bridge would probably cause physical harm to others below.

In sum, we hold that each charge and specification was supported by legally sufficient evidence. Therefore, we overrule Cooey's nineteenth proposition of law.

In his thirty-first proposition of law, Cooey argues that a verdict of guilt, though supported by legally suf-

ficient evidence, may nevertheless be overturned as against the weight of the evidence. *State* v. *Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E. 2d 148.

In *Robinson,* we observed that courts of appeals have power to "consider and pass upon the weight of the evidence." *Id.* at 487, 55 O.O. at 388, 124 N.E. 2d at 149. See Section 3(B)(3), Article IV, Ohio Constitution. But we have no such power; our review "is limited to a determination of whether there was evidence presented, 'which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *State* v. *Eley* (1978), 56 Ohio St. 2d 169, 172, 10 O.O. 3d 340, 341, 383 N.E. 2d 132, 134. See, also, *State* v. *Glenn* (1986), 28 Ohio St. 3d 451, 456, 28 OBR 501, 505, 504 N.E. 2d 701, 707. Having found the evidence legally sufficient on all counts, we overrule this proposition of law.

### B

At trial, Cooey tried to introduce expert testimony that his faculties were so impaired by the combined effect of alcohol, drugs, and a mental disorder that he was incapable of forming specific intent. The testimony was excluded. In his sixteenth and seventeenth propositions of law, Cooey argues that the testimony should have been admitted into evidence.

It is well-settled that a defendant may present evidence that he was intoxicated to disprove the existence of specific intent. *State* v. *Fox* (1981), 68 Ohio St. 2d 53, 22 O.O. 3d 259, 428 N.E. 2d 410. However, except in the mitigation phase of the trial, he "may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that * * * [he] lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime." *State* v. *Wilcox* (1982), 70 Ohio St. 2d 182, 24 O.O. 3d 284, 436 N.E. 2d 523, paragraph two of the syllabus.

The *Wilcox* rule is based on a mistrust of the ability of psychiatry to accurately "fine-tune" degrees of capacity among offenders who are sane — *i.e.,* who have the minimal capacity to act voluntarily. *Wilcox, supra,* at 190-194, 24 O.O. 3d at 289-291, 436 N.E. 2d at 528-530. It is irrelevant, in our view, whether the asserted incapacity to form *mens rea* is caused by a mental disorder, by intoxication, or (as Cooey contends here) by a combination of the two. We are offered nothing to convince us that psychiatric "fine-tuning" would be any more accurate where the asserted incapacity is caused by intoxication.

As we noted in *Wilcox,* lay jurors need no expert testimony to determine whether the accused was too intoxicated to be able to intend anything. *Wilcox, supra,* at 194, 24 O.O. 3d at 291, 436 N.E. 2d at 530. To allow psychiatric testimony on specific intent would bring into Ohio law, under another guise, the diminished capacity defense we rejected in *Wilcox.* We therefore hold that a defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that, due to mental illness, intoxication, or any other reason, he lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime. In accordance with this holding, Cooey's sixteenth and seventeenth propositions of law are overruled.

### C

Cooey's thirteenth, fourteenth, and fifteenth propositions of law challenge the admissibility of his tape-recorded statements to police.

In his thirteenth proposition of law, Cooey argues that his interrogators falsely indicated that the cor-

oner's tests conclusively showed that Cooey had intercourse with both victims. Cooey asserts that because the officers lied to him, his statements were involuntary as a matter of law.

We reject this proposition for two reasons. First, the record does not support Cooey's allegation that the officers lied. They did not claim that the tests had already pinpointed Cooey as the offender. Sergeant Hammond told Cooey that the tests showed "that both girls had had intercourse." As the coroner later testified, this was true. Detective Taliercio then told Cooey: "And, see, the thing is that we're gonna be able to tell." Although this prediction was wrong, it does not support Cooey's claim that the officers lied to him.

Second, assuming that the officers lied to Cooey, that would not necessarily make his statements involuntary. The use of deceit is merely "* * * a factor bearing on voluntariness." *Schmidt* v. *Hewitt* (C.A. 3, 1978), 573 F. 2d 794, 801. See *Frazier* v. *Cupp* (1969), 394 U.S. 731, 739.

In his fourteenth proposition of law, Cooey asserts that his waiver of Fifth Amendment rights was involuntary. Initially, we observe that he signed a written waiver, which is strong proof that the waiver was voluntary. *North Carolina* v. *Butler* (1979), 441 U.S. 369, 373.

Cooey claims that he was asked only whether he understood his rights, not whether he wanted to waive them. He maintains that signing the waiver was intended solely as an acknowledgment that he understood his rights, rather than as a waiver.

However, the language of the waiver form is clear. Its final paragraph states:

## "WAIVER OF RIGHTS

"I have read this statement of my rights and I understand what my rights are. *I am willing to make a statement and answer questions. I do not want a lawyer at this time.* I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." (Emphasis added.)

Given this language, Cooey could not have supposed that he was merely acknowledging that he understood his rights.

Cooey further argues that, after each break in the interrogation, the officers were required to administer full *Miranda*[1] warnings before resuming. Thus, since the warnings were not repeated in full after each break, any statements Cooey made after the interview was first interrupted were inadmissible.

We do not believe, under the totality of the circumstances here, that the initial *Miranda* warnings ever became too stale so as to fail to protect Cooey from the coerciveness inherent in custodial interrogation. See *State* v. *Roberts* (1987), 32 Ohio St. 3d 225, 231-233, 513 N.E. 2d 720, 725-726.

Cooey's interrogation began immediately after the warnings were given at 10:00 p.m. Although there were breaks in the interrogation, there was no lengthy period between the warnings and the interrogation, as there was in *Roberts*. The warnings here "were given in the context of interrogation." *Roberts, supra,* at 232, 513 N.E. 2d at 726. Moreover, this was the second time Cooey had heard the warnings that night. (He had already heard them when arrested at 9:15 p.m.) The warnings were repeated, in full, at 10:30 p.m. The warnings and the interrogation were conducted at

---

[1] *Miranda* v. *Arizona* (1966), 384 U.S. 436.

the same place (the Akron Police Department) by the same officers (Hammond and Taliercio).

Cooey's intellectual and emotional state is a factor to be considered. *Roberts, supra,* at 232, 513 N.E. 2d at 726, citing *State* v. *McZorn* (1975), 288 N.C. 417, 434, 219 S.E. 2d 201, 212. Cooey had a high school education, and Hammond testified that he appeared calm. Moreover, each time Hammond resumed interrogation, he reminded Cooey that he had been informed of his rights.

Finally, between the final full administration of the warnings at 10:30 p.m. and the beginning of the final round of interrogation at 2:45 a.m., a mere four hours and fifteen minutes had elapsed. During this time, according to Cooey, there were three breaks in the interrogation. The first of these "breaks" (from 10:46 to 11:59) occurred when Cooey guided police to Clint Dickens' home. Since Cooey was giving information to the police, this was not a true "break" in the questioning. None of the other breaks lasted over one hour and twenty-one minutes. On this record, we do not believe the warnings could " "* * * have become so stale as to dilute their effectiveness. * * *" " *Roberts, supra,* at 232, 513 N.E. 2d at 726, quoting *State* v. *Burge* (1985), 195 Conn. 232, 248-249, 487 A. 2d 532, 543.

Cooey's final contention under his fourteenth proposition of law is that he revoked his waiver and indicated that he wanted the questioning to stop. See *Michigan* v. *Mosley* (1975), 423 U.S. 96. During the interrogation, Hammond told Cooey that, if the physical evidence proved that Cooey raped Dawn, "you've just buried yourself" by denying it. Cooey replied, "I know that." He argues that this statement "impl[ied] that he had told them all he knew and * * * did not wish to make

any further statements." This theory can most charitably be described as farfetched. In our view, no such implication can possibly be gleaned from Cooey's reply.

Having rejected Cooey's fourteenth proposition of law, we turn to his fifteenth, in which he argues that his statements were involuntary.

The use of an "inherently coercive tactic" during interrogation is a prerequisite to a finding of involuntariness. Such tactics include, *e.g.,* physical abuse, threats, or deprivation of food, medical treatment, or sleep. *State* v. *Clark* (1988), 38 Ohio St. 3d 252, 261, 527 N.E. 2d 844, 854.

Cooey alleges that he was not given food or an opportunity to sleep. The record does not indicate that he desired to eat. Moreover, we note that his statements were completed within six hours of his arrest. Finally, his claim that he had no chance to sleep rings hollow given that questioning was suspended for at least one hour and twenty-one minutes during the six hours in question.

Cooey also claims that Hammond "threatened" him by warning him that, if he had lied, he had "buried" himself. We disagree. In *United States* v. *Barfield* (C.A. 5, 1975), 507 F. 2d 53, a defendant was told that it would be in "his best interest" to tell the "real story," whereas lying might leave him "holding the bag." *Id.* at 55. These statements were held to be neither threats nor promises, but permissible admonitions to tell the truth. *Id.* at 56. See, also, *State* v. *Edwards* (1976), 49 Ohio St. 2d 31, 39-41, 3 O.O. 3d 18, 23-24, 358 N.E. 2d 1051, 1059, vacated on other grounds (1978), 438 U.S. 911. Hammond's tactic closely resembles the tactics approved in *Barfield* and *Edwards.* We think that it, too, was no more than an admonition to tell the truth.

No "police overreaching," *Clark, supra,* at 261, 527 N.E. 2d at 854, is evident here. We therefore overrule Cooey's fifteenth proposition of law.

### D

After Cooey's arrest, police obtained a warrant to search his house and car for, *inter alia,* two gold necklaces, four gold bracelets, five rings, two watches, and a nightstick. The executing officers found one necklace, two bracelets, five rings, and one watch in Cooey's car. They found the nightstick in his bedroom.

Cooey's motion to suppress was denied. In his twenty-seventh proposition of law, he argues that his motion should have been granted because the warrant was not supported by probable cause to believe the items sought would be found in the places to be searched.

Akron Detective Lynn Hillegas signed an affidavit relating, *inter alia,* his conversation with Cooey's friend, David Jones. The key paragraph of this affidavit states:

"* * * On September 2, 1986, * * * [Hillegas] spoke to one David I. Jones, who stated that he had been visited on September 1, 1986, by a Richard W. Cooey * * * who attempted to sell the above described jewelry to him. Cooey stated that he, along with two other males, had robbed two females earlier and had dumped their bodies in a wooded area near Rolling Acres Mall. Cooey stated that he had bludgeoned the females in the head with a billy club. Cooey stated that he had strangled and raped the victims."

The affidavit goes on to relate Jones' description of how Cooey and his accomplices disabled Wendy's car, then offered the women help.

The affidavit stated details corroborating some of Jones' story. The coroner had found evidence that the women had been beaten on the head, sexually assaulted, and strangled. Wendy's mother confirmed "that her daughter had called her the night of the murders and told her about the rock being dropped on her car from above the freeway."

The judge issuing the warrant also took testimony from Hillegas and Officer Wright of the Norton Police Department. Wright testified that Wendy's mother told him that Wendy had worn a black-banded wristwatch. Hillegas testified that Cooey had just been arrested at home with such a watch on his person.

On these facts, probable cause existed to search Cooey's home for the jewelry. "* * * In normal situations, few places are more convenient than one's residence for use in * * * hiding fruits of a crime. * * *" *United States v. Green* (C.A. 5, 1981), 634 F. 2d 222, 226. Moreover, Cooey was trying to sell the jewelry. That indicates that he placed some value on it, and would have wanted to keep it someplace safe and accessible. Finally, there was a direct nexus between the stolen property and Cooey's home: when Cooey was arrested there, Hillegas saw that he had a watch resembling Wendy's in his possession. Giving great deference, as we must, to the magistrate's probable cause determination, see *United States v. Ventresca* (1965), 380 U.S. 102, 108, we hold that probable cause existed to search the house.

The car search presents a separate problem. The state contends that there was reason to believe that Cooey had been in his car after committing the murders. However, the magistrate had no such information. Information not provided to the magistrate cannot be considered in assessing a warrant's validity. *State v. Graddy* (1978), 55 Ohio St. 2d 132, 134, 9 O.O. 3d 109, 111, 378 N.E. 2d 723, 725, fn. 1. Thus,

we need not decide whether that information would by itself establish probable cause to believe that the jewelry was in the car.

Absent a showing of probable cause, the jewelry found in the car should have been suppressed. However, the evidence of aggravated robbery was overwhelming. Cooey's confession showed that he agreed to rob Wendy and Dawn; that he handed Dickens the knife he used to take Dawn's purse; that he took jewelry from Wendy's body; and that he split $37 in cash, proceeds of the robbery, with Dickens. David Jones saw Cooey in possession of bloodstained jewelry. Finally, the black watch Cooey had when he was arrested was identified as Wendy's. Given this evidence, we find the erroneous admission of the jewelry harmless.

Cooey also objects to the seizure of clothing from his home, since it was not listed in the warrant. Since the clothing was not introduced at trial, and yielded no evidence against him, Cooey was not prejudiced by its seizure.

Cooey's twenty-seventh proposition of law is overruled.

E

In his first proposition of law, Cooey contends that the indictment was invalid because it was not signed by the foreman of the grand jury. Crim. R. 6(F). However, the record contains two copies of the indictment, one of which bears the foreman's signature. Both copies bear date stamps indicating that they were filed with the trial court on September 8, 1986. The signed indictment was not in the record as we received it from the court of appeals, but was later sent to us separately by the trial court. Upon learning of this, Cooey filed a "motion to strike additional papers," which we

denied. 41 Ohio St. 3d 727, 536 N.E. 2d 382.

Cooey argues that the signed indictment is not part of the record because it was not entered onto the trial court's journal until after the other original papers were journalized. We disagree. Regardless of when the signed indictment was journalized, that it was journalized at all requires us to accept it as genuine and as having been filed at the time indicated by the date stamp, for the journal of a court of record imports absolute verity absent clear and convincing evidence to the contrary. *Breeds* v. *McKinney* (1960), 171 Ohio St. 336, 341, 14 O.O. 2d 8, 11, 170 N.E. 2d 850, 853; *Telling Belle Vernon Co.* v. *Zupancic* (App. 1935), 19 Ohio Law Abs. 570, 572, petition in error dismissed (1935), 130 Ohio St. 170, 4 O.O. 62, 198 N.E. 34.

Nor do we think that the signed indictment should be ignored because it was not in the record that was originally transmitted to us. Since the signed indictment was filed in the trial court, it was part of that court's record of this trial. The trial court had the supervisory power to restore the record to its original condition at *any* time. *Hollister* v. *Judges of Lucas Cty. Dist. Court* (1857), 8 Ohio St. 202, 204.

Because the signed indictment is part of the record in this case, we overrule Cooey's first proposition of law.

F

In his tenth proposition of law, Cooey argues that he was prejudiced in the guilt phase by prosecutorial argument that discussed the feelings of the victims' families. The prosecutor said:

"What was taken away here was sacred life. We have two families, in addition to what these girls were terrorized with, we have two families that have lost the most precious gift we can receive and that is their children.

"Now, I don't — I can't feel and I don't know how to feel for them, what they're going through, and nobody else in this courtroom can feel that, but that gift has been taken away from them for criminal intent that we have a difficult time even understanding."

We agree, of course, that this argument was irrelevant to guilt or innocence. But in the absence of objection either at trial or in the court of appeals, we may consider only whether it was plain error. *State* v. *Lawrence* (1989), 44 Ohio St. 3d 24, 27, 541 N.E. 2d 451, 456; *State* v. *Broom* (1988), 40 Ohio St. 3d 277, 288-289, 533 N.E. 2d 682, 695-696.

An error "does not constitute a plain error or defect under Crim. R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise. Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. * * *" *State* v. *Long* (1978), 53 Ohio St. 2d 91, 97, 7 O.O. 3d 178, 181, 372 N.E. 2d 804, 808. Under this standard, we cannot find plain error. The reference was brief, the evidence overwhelming, and the case was tried to a three-judge panel. It is far from clear — indeed, it is highly unlikely — that the outcome would have been otherwise absent the statements of the prosecutor. We overrule Cooey's tenth proposition of law.

## II

Having rejected Cooey's claims of error in the guilt phase, we now consider his claims of error in the penalty phase.

### A

Cooey pled not guilty by reason of insanity. The court ordered psychiatric examinations pursuant to R.C. 2945.39. Dr. Kathleen Quinn conducted the examination and submitted a written report, whereupon Cooey withdrew his insanity plea.

Although the trial court did not consider the Quinn report in sentencing, it did consider the presentence investigation report ("PSI") which quoted from the Quinn report. Among the portions quoted was a passage in which Quinn stated that Cooey admitted to her that he hit the victims with the nightstick.

Cooey argues that the use of his statements to Quinn in the presentence investigation report violated R.C. 2945.39(D). Alternatively, he argues that, if R.C. 2945.39(D) authorizes the introduction of a defendant's statements made during a court-ordered psychiatric examination, it is inconsistent with the Fifth Amendment.

We consider first Cooey's constitutional claim. R.C. 2945.39(D) provides:

"No statement made by a defendant in an examination or hearing relating to his mental condition at the time of the commission of an offense shall be used in evidence against him on the issue of guilt in any criminal action."

According to Cooey, this implies that such statements may be introduced on the issue of penalty, as they were here. Thus, he contends, a defendant can "explor[e] an insanity defense" only at the cost of giving up his right not to incriminate himself.

We reject Cooey's interpretation of R.C. 2945.39(D). He reads the statute as creating a dichotomy between "the issue of guilt" and the issue of penalty, forbidding the use of the defendant's statements in the guilt phase while permitting it in the penalty phase. If that were so, Cooey's statements could not be used in the guilt phase to refute his insanity defense. Yet it is evident that the

reason for a *court-ordered* examination is to alleviate the unfairness that would result if a defendant could plead not guilty by reason of insanity, use his own psychologist's testimony to prove his plea, and block any possibility of rebuttal by refusing to submit to any other mental examination. See *United States* v. *Byers* (C.A.D.C. 1984), 740 F. 2d 1104, 1113 (*en banc*) (plurality opinion).

We conclude that the statute distinguishes, not between the issues of guilt and penalty, but between the issues of guilt — *i.e.,* factual guilt — and insanity. Cf. Fed. R. Crim. P. 12.2(c) (defendant's statements in court-ordered examination not to be used against him "except on an issue respecting mental condition on which the defendant has introduced testimony"); *United States* v. *Bohle* (C.A. 7, 1971), 445 F. 2d 54, 66, overruled on other grounds, *United States* v. *Lawson* (C.A. 7, 1981), 653 F. 2d 299, 303, fn. 12. Thus, a defendant's statements made in the course of a court-ordered psychological examination may be used to refute his assertion of mental incapacity,[2] but may not be used to show that he committed the acts constituting the offense.

So construed, the statute is constitutional. If a defendant requests a psychiatric evaluation or presents psychiatric evidence, "the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. * * *" *Buchanan* v. *Kentucky* (1987), 483 U.S. 402, 422-423.

We therefore reject Cooey's challenge to the constitutionality of R.C. 2945.39(D). Since he requested the examination, use of the Quinn report did not violate R.C. 2945.39(D) if limited to the issue of his mental condition. However, Cooey's statement to Quinn, reported in the PSI, that he hit the victims has no apparent relevance to rebutting the evidence of Cooey's psychological state. It does have immediate relevance to the degree of his involvement in the crimes. Therefore, its admission into evidence violated R.C. 2945.39(D).

We do not, however, find it plain error. Dr. Quinn was not the only one to whom Cooey admitted that he hit the victims. There was abundant evidence in the guilt phase that Cooey was a principal offender. Cooey admitted to police that he choked Wendy. He admitted to Terry Grant that he beat both women with a nightstick. Finally, David Jones testified that Cooey confessed to personally killing the women.

In the face of this evidence, we cannot accept that the court clearly would have found, but for the error, that Cooey did not strike the women with the nightstick. Nor is it clear that, even if it had so found, it would have spared Cooey's life. We therefore overrule Cooey's eighth and ninth propositions of law.

Cooey's twenty-ninth and thirtieth propositions of law also object to the use of the Quinn report. Again, these objections were not raised in the court of appeals, and therefore must be considered under plain error analysis, if at all.

Cooey's twenty-ninth proposition of law asserts that the introduction of the Quinn report without requiring Quinn to testify violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. We have held, however:

---

[2] We see no reason to distinguish, in this regard, between using statements in the guilt phase to rebut an insanity defense and using them in the penalty phase to rebut the establishment of a mitigating factor.

"* * * All that due process requires with respect to post-conviction reports is giving the defendant a chance to rebut any alleged inaccuracies. * * * Due process is not denied a defendant who fails to challenge the accuracy of statements as to which he has been denied an opportunity for cross-examination or confrontation. See *Williams* v. *New York* (1949), 337 U.S. 241, rehearing denied (1949), 337 U.S. 961; *Williams* v. *Oklahoma* (1959), 358 U.S. 576, rehearing denied (1959), 359 U.S. 956. * * *" *State* v. *Williams* (1986), 23 Ohio St. 3d 16, 23, 23 OBR 13, 19, 490 N.E. 2d 906, 913. See, also, *Gregg* v. *Georgia* (1976), 428 U.S. 153, 189, fn. 37 (plurality opinion). But, see, *Proffitt* v. *Wainwright* (C.A. 11, 1982), 685 F. 2d 1227, modified (C.A. 11, 1983), 706 F. 2d 311.

The mitigation hearing mandated by R.C. 2929.03(D) gave Cooey "a chance to rebut any alleged inaccuracies" in the Quinn report; he was entitled to no more.

In Cooey's thirtieth proposition of law, he argues that the Quinn report should not have been introduced because it contained Dr. Quinn's opinion that Cooey was legally sane. (We note that the PSI did not mention this opinion.) Since sanity or insanity is not at issue in the penalty phase, see *Lawrence, supra,* at 29, 541 N.E. 2d at 457, Cooey argues that the report was irrelevant and, in effect, made his sanity an aggravating circumstance.

We disagree. While Cooey's sanity was not at issue, he did raise his alleged mental disorder as a mitigating factor. We cannot accept the proposition that a psychological report on sanity is irrelevant to the existence of a mitigating factor under R.C. 2929.04 (B)(3). The issues involved are similar: whether a "mental disease or defect" existed and, if so, whether and to what degree it may have impaired his cognition and volition. Of course, the issues are not identical, since the mitigating factor requires not a total incapacity but only a lack of "substantial" capacity. But that does not make the results of the sanity evaluation irrelevant.

Moreover, it is not clear that the result would have been otherwise had the Quinn report been excluded. The trial court did not consider the report. Nor did it, as Cooey claims, use his sanity as a ground for rejecting the R.C. 2929.04(B)(3) mitigating factor. Rather, it rejected the mitigating factor because Dr. James W. Siddall, one of Cooey's witnesses, testified that Cooey had no mental disease or defect.

We find no error in the introduction of the Quinn report. Had there been error, it was not plain error and was therefore waived in the court of appeals. We therefore overrule Cooey's twenty-ninth and thirtieth propositions of law.

B

In his second, third, fourth, and fifth propositions of law, Cooey objects to the use of victim impact statements (R.C. 2947.051) dealing with the impact of the murders on the victims' survivors. He argues that the use of such statements is forbidden by *Booth* v. *Maryland* (1987), 482 U.S. 496. He also argues that because the defense was not allowed to review the statements, he was denied his constitutional right to present a defense and have the effective assistance of counsel at trial and on appeal.

"Absent an indication that the panel was influenced by or considered victim impact evidence in arriving at its sentencing decision," its admission is not reversible error where the case is tried to a three-judge panel. *State* v. *Post* (1987), 32 Ohio St. 3d 380, 384, 513 N.E. 2d 754, 759. Here, the

34

sentencing opinion specifically states that the victim impact statements had no bearing on the court's decision to impose the sentence of death.

Nonetheless, Cooey argues that the record also contains affirmative indications that the statements were considered. When sentencing Cooey on December 5, 1986, the court said:

"You will never know the degree of pain that you have inflicted on the families of Wendy and Dawn.

"This Court will see to it that you never have the opportunity to repeat these acts during the remainder of your life."

Cooey argues that this statement shows that "the degree of pain * * * inflicted on the families * * *" was a factor in sentencing him to death. However, the court sentenced Cooey not only on the aggravated murder convictions, but simultaneously on all counts of the indictment. The sentencing opinion states that the victim impact statements were considered "as required by * * * [R.C.] 2929.12 * * *" — i.e., in determining the minimum sentences for the non-capital felonies. This indicates that the court invoked the suffering of the survivors not in justification of the death penalty, but in justification of the lengthy consecutive sentences imposed for the non-capital felonies.

Our view is reinforced by the statement: "This court will see to it that you never have the opportunity to repeat these acts during the remainder of your life." (Emphasis added.) We note that the court began to pronounce sentence for the non-capital felonies immediately after this statement.

Cooey argues that the court, by allowing the prosecutor to mention the impact of the murders on the victims' families in his argument in the penalty phase, manifested an intention to consider that factor in sentencing. Given the lack of any defense objection to the prosecutor's statements, however, we think this inference unjustified.

We find no affirmative indication that the victim impact statements were considered in sentencing Cooey to death, and therefore overrule his second proposition of law. This analysis also disposes of Cooey's argument that he was prejudiced by not being allowed to see the victim impact statements at trial. Nor was his right to effective assistance of counsel impaired on the appeal because Cooey's counsel in the court of appeals were not provided with copies. In light of Post, Cooey could not have prevailed on this issue in the court of appeals. Moreover, he has had complete access to the victim impact statements for this appeal and will continue to have such access for collateral review. Accordingly, we overrule his third, fourth, and fifth propositions of law.

In his sixth proposition of law, Cooey contends that because the victim impact statements dealt largely with the impact of the murders, they should not have been considered in sentencing Cooey on the non-capital offenses.

We think it obvious that the impact of the murders was relevant to sentencing on the other charges. R.C. 2929.12(A) requires the court to consider "* * * the risk that the offender will commit another crime and the need for protecting the public from the risk * * *." The offender's history of committing crimes, including aggravated murder, is relevant to "the risk that * * * [he] will commit another crime[,]" and the magnitude of the harm suffered by the victim's family is relevant to "the need for protecting the public from the risk * * *." We therefore overrule Cooey's sixth proposition of law.

In his seventh proposition of law,

Cooey claims that the PSI prepared at his request under R.C. 2929.03(D)(1) was prepared improperly.

He complains that the report was unfairly phrased, and therefore unfavorable to him, and that it omitted favorable information. As examples of omitted information, Cooey notes that the report does not state whether he "liked sports and excelled at any one of them" or "enjoyed reading on his own." We do not see how such information would have been relevant to mitigation; in any case, the record does not show that the "omitted" information was true.

Cooey did not challenge the report's accuracy or completeness at the hearing. "* * * Not only does appellant fail to argue that the reports are inaccurate, but he also failed to exercise the opportunity at the mitigation hearing to correct any erroneous information. * * *" *State* v. *Williams, supra,* at 23, 23 OBR at 19, 490 N.E. 2d at 913.

A reviewing court is hardly the appropriate forum for settling disputes about what was said to the investigator and why he used a particular word or phrase. Cooey could have called the witnesses interviewed by the investigator. Cf. *State* v. *Glenn, supra,* at 460, 28 OBR at 508, 504 N.E. 2d at 710. He could also have disputed the PSI's statements and characterizations in his own unsworn statement.

Cooey argues that the report should not have mentioned, under the heading "Prior Criminal Record," allegations that he had committed crimes for which he had not been tried. While such offenses may not be part of one's "criminal record" under Crim. R. 32.2(B), the same rule requires the inclusion of a defendant's "social history" in the report. The incidents referred to in the report were an assault in which the victim's jaw was broken and a sexual assault on a two-year-old. Whether or not they resulted in criminal charges, these occurrences are part of Cooey's social history.

Cooey notes that an Akron police captain's recommendation that Cooey be executed was included. This opinion was irrelevant. However, it does not appear that the trial court placed any reliance on the captain's recommendation. We find this error harmless beyond a reasonable doubt.

Finally, Cooey maintains that the investigator should not have attempted to assess the veracity of his story by reporting that other people contradicted it. However, we have emphatically rejected the notion "that the jury is to be carefully fed only that information which reflects positively upon * * *" capital defendants. *State* v. *Greer* (1988), 39 Ohio St. 3d 236, 253, 530 N.E. 2d 382, 402. Cooey minimized his involvement in these crimes. Information about the extent of that involvement was relevant even if it conflicted with Cooey's version. His seventh proposition of law is therefore overruled.

In his eleventh proposition of law, Cooey argues that the prosecutor's argument in the penalty phase was improper because it referred to the grief of the victim's families, evoked the terror suffered by Wendy and Dawn themselves, and denounced the "brutality" of the murders.

The references to the victims' families were improper. *Booth* v. *Maryland, supra.* We note, however, that no objection was made at trial, nor was this issue raised on appeal. Given the aggravating circumstances here, we cannot hold that plain error occurred, especially where the case was tried to a three-judge panel. See *Post, supra.*

As for the prosecutor's references to the suffering inflicted on Wendy and

Dawn, we think it clear that *Booth* does not preclude such argument. Suffering inflicted on the victim by the killer is within the killer's control; thus, it is not "wholly unrelated to the blameworthiness of a particular defendant. * * *" *Booth, supra,* at 504.

Nonetheless, we agree with Cooey's contention that the victims' suffering should not have been raised by the state. The prosecutor may properly discuss the nature and circumstances of the offense, but only if the defense raises the subject. See *State* v. *DePew* (1988), 38 Ohio St. 3d 275, 289, 528 N.E. 2d 542, 557. Cooey made no effort to show the existence of mitigating factors in the nature and circumstances of these murders.

In the absence of objection at trial, we apply a plain error standard. We note that the trial court did not regard the brutal nature of the murders as aggravating. The sentencing opinion enumerates the aggravating circumstances precisely, listing only those of which Cooey was convicted. We do not believe that the outcome clearly would have been otherwise had the prosecutor not erred. Accordingly, we overrule Cooey's eleventh proposition of law.

### C

In his eighteenth proposition of law, Cooey argues that the aggravating circumstance defined by R.C. 2929.04(A)(7) is identical to the crime of aggravated murder defined by R.C. 2903.01(B). We have, of course, consistently rejected this contention and we reject it here. See, *e.g., State* v. *Barnes* (1986), 25 Ohio St. 3d 203, 206-207, 25 OBR 266, 269, 495 N.E. 2d 922, 925.

Cooey's arguments, which in effect ask us to overrule *Barnes,* are not persuasive and we therefore overrule his eighteenth proposition of law.

Cooey's twenty-first proposition of law is summarily overruled on the authority of *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 167-179, 15 OBR 311, 314-324, 473 N.E. 2d 264, 272-281.

In his twenty-second proposition of law, Cooey maintains that twenty-six color slides showing the victims' bodies were gruesome and cumulative, and that their probative value did not outweigh their potential for prejudice. See *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 15 OBR 379, 473 N.E. 2d 768, paragraph seven of the syllabus.

We find that eleven of these slides (Exhibits C-3, C-4, C-6, C-7, C-10, C-15, C-16, C-18, C-27, C-28, and C-29) cannot fairly be called gruesome. Exhibit C-7 was taken from a distance and is relatively undetailed. Exhibit C-4 shows a head wound almost entirely obscured by hair. The others show nothing more than bruises, lacerations and minor abrasions.

The remaining slides detail the injuries to Wendy and Dawn. Although unpleasant, these are highly probative. We consider four of them (Exhibits C-5, C-9, C-12, and C-13) repetitive. Given the overwhelming evidence of Cooey's guilt, however, their admission was harmless error. Moreover, for reasons set forth more fully below, we think that the preponderance of aggravating circumstances over mitigating factors was also established by overwhelming evidence; we therefore find the error harmless as to the penalty. We overrule Cooey's twenty-second proposition of law.

Cooey's twenty-third proposition of law is summarily overruled on the authority of *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 31 OBR 273, 509 N.E. 2d 383, paragraph one of the syllabus.

In his twenty-fourth proposition of law, Cooey argues that R.C. 2929.04 (B)(3) is unconstitutionally vague because it does not define the term

"mental disease or defect." We held in *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 140, 22 OBR 203, 217, 489 N.E. 2d 795, 810, that the "mitigating factors" defined in R.C. 2929.04(B) "* * * are explicit enough to require no further illumination."

Cooey further argues that the narrowness of the concept of "mental disease or defect" as apparently construed by the trial court and the court of appeals denied him the opportunity to have his "mental disorder" considered in his favor, violating the principles of *Lockett* v. *Ohio* (1978), 438 U.S. 586. However, a capital defendant's mental state may be considered in his favor under the general provision of R.C. 2929.04(B)(7), whether or not it is the product of a mental disease or defect.

Both courts considered Cooey's abusive family history and his substance abuse in mitigation. Dr. Siddall's testimony shows that Cooey's mental problems were significantly related to these aspects of his history. Cooey's twenty-fourth proposition of law is overruled.

In his twenty-eighth proposition of law, Cooey argues that the trial court erred in the penalty phase by defining "reasonable doubt" to the jury as it is defined in R.C. 2901.05(D). We have held that R.C. 2901.05(D) correctly defines this "abstract" legal concept. *State* v. *Nabozny* (1978), 54 Ohio St. 2d 195, 202-203, 8 O.O. 3d 181, 185, 375 N.E. 2d 784, 791.

## D

In his thirty-third proposition of law, Cooey argues that the alleged errors he assigns cumulatively prejudiced his cause in the sentencing phase. We have already rejected some of these assignments of error, and some assigned errors were not objected to at the trial or appellate levels.

In any event, "[i]t is clear beyond a reasonable doubt that the large body of properly admitted evidence, standing alone, constituted overwhelming evidence * * *." *State* v. *Williams* (1988), 38 Ohio St. 3d 346, 358, 528 N.E. 2d 910, 923. This proposition of law is overruled.

## E

With respect to each victim, Cooey was charged with two counts of aggravated murder: one count under R.C. 2903.01(A), murder with prior calculation and design, and one under R.C. 2903.01(B), felony murder. In his twentieth proposition of law, Cooey argues that the trial court should have required the state to choose, before trial, between charges of murder with prior calculation and design or felony murder with respect to each victim.

Although the trial court required the state to make such a choice before the penalty phase, Cooey argues that he was prejudiced because the trial court, having convicted him of four counts of aggravated murder with twelve specifications, proceeded to weigh all twelve specifications against him when it should have weighed only six (three for each murder). In support of this assertion, Cooey cites language in the sentencing opinion stating that the sentence was "based upon * * * [the court's] consideration of[,]" among other things, its verdict "* * * that the Defendant was guilty of four counts of Aggravated Murder with three specifications each * * *."

However, other language in the opinion indicates that the trial court did not engage in double counting of aggravating circumstances. The section of the opinion dealing specifically with aggravating circumstances stated: "[t]he *six* aggravating circumstances of which the Defendant was found guilty * * * are as follows

* * *." (Emphasis added.) The opinion then enumerated the six aggravating circumstances of which it spoke: three relating to Wendy's murder and three relating to Dawn's murder. Even in the passage Cooey cites, the trial court stated that "* * * the two specifications charging a course of conduct * * * should be considered as a single aggravating circumstance, reducing the number to *five*." (Emphasis added.)

Additionally, it is hardly likely that the trial court would have insisted that the prosecutor make an election between counts unless it knew of its obligation not to engage in double counting of aggravating circumstances. Read as a whole, the sentencing opinion precludes the inference that duplicative aggravating circumstances "* * * were applied in an overzealous manner to the same act or indivisible course of conduct." *State* v. *Jenkins, supra,* at 197, 15 OBR at 339, 473 N.E. 2d at 294.

Assuming that the trial court had double counted the aggravating circumstances, independent review by this court would cure the error as it cured a similar error in *Jenkins, supra,* at 199-200, 15 OBR at 341-342, 473 N.E. 2d at 296-297. Accordingly, we overrule Cooey's twentieth proposition of law.

In Cooey's twelfth, twenty-fifth, and twenty-sixth propositions of law, he contends that the trial court and the court of appeals improperly weighed aggravating circumstances against mitigating factors.

Cooey argues that the trial court erred in combining the aggravating circumstances related to *both* murders,

and weighing all of them collectively against the mitigating factors. We agree. As Cooey states, each murder was a separate offense subject to a separate penalty. By adding together the aggravating circumstances of both murders in the penalty phase, the trial court denied Cooey that "consideration of * * * the circumstances of the *particular* offense * * *" that is "a constitutionally indispensable part of the process of inflicting the penalty of death." (Emphasis added.) *Woodson* v. *North Carolina* (1976), 428 U.S. 280, 304 (plurality opinion).

Therefore, when a capital defendant is convicted of more than one count of aggravated murder, the penalty for each individual count must be assessed separately. Only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count.

One case in which such an error could be prejudicial would be one where aggravation outweighed mitigation on one count, but not on the other. In such a case, if aggravation outweighed mitigation on the first murder count by a greater "margin" than mitigation outweighed aggravation on the second murder count, the total aggravating circumstances would outweigh the total mitigating factors. Thus, the error would cause the imposition of two death sentences instead of one.[3]

Another case in which such an error could be prejudicial would be one where a single set of mitigating factors outweighed the aggravating circumstances attached to each individual murder, but the aggravating circumstances for both murders, taken

---

[3] We place "margin" in quotation marks to underscore its metaphorical quality. We do not expect the mathematical precision that "margin" might otherwise imply.

together, outweighed the single set of mitigating factors.

We do not think it is clear that the trial court's error determined the result. Indeed, we conclude that the aggravating circumstances of each murder, weighed separately, outweigh the mitigating factors. Thus, although the trial court erred, its error was not plain error, and therefore not reversible error in light of Cooey's failure to raise it in the court of appeals.

Cooey argues that the trial court should have merged the R.C. 2929.04 (A)(3) specification accompanying each count with the R.C. 2929.04(A)(7) specification also accompanying each count. His argument is based on the erroneous premise that the R.C. 2929.04(A)(7) specification could be used in any prosecution for felony murder, R.C. 2903.01(B), where the victim is also a victim of or a witness to the underlying felony. We rejected a similar argument in *State* v. *Stumpf* (1987), 32 Ohio St. 3d 95, 103-104, 512 N.E. 2d 598, 607. See, also, *Jenkins, supra,* at 197, 15 OBR at 339, 473 N.E. 2d at 294.

However, he also argues that, under the facts in this case, the specifications should have been merged because they arose from the same acts and were committed with the same animus. See *Jenkins, supra,* at 194-200, 15 OBR at 337-342, 473 N.E. 2d at 292-297; *State* v. *Logan, supra,* syllabus. We agree. The specifications for which Cooey was trying to escape accountability when he killed Wendy and Dawn (R.C. 2929.04 [A][3]) are the same as those that support his convictions of the felony murder specifications (R.C. 2929.04 [A][7]). Thus, the "escaping accountability" specifications lack "a significance independent of the other" specifications. *Logan, supra,* at 135, 14 O.O 3d at 378, 397 N.E. 2d at 1351.

Cooey did not raise this error in the court of appeals, and we find it far from clear that it affected the panel's verdict. We therefore cannot hold it plain error.

Cooey correctly asserts that the trial court erred by considering all of the mitigating factors set forth in R.C. 2929.04(B) even though Cooey did not raise some of them. See *State* v. *DePew, supra,* at 289-290, 528 N.E. 2d at 557-558. However, the sentencing opinion lists what the court understood to be the aggravating circumstances, and the absence of mitigating factors is not among them. Cf. *State* v. *Broom, supra,* at 292, 533 N.E. 2d at 699, fn. 6. We conclude that the absence of mitigating factors was not impermissibly transformed into an aggravating circumstance.

Cooey, who was nineteen when he committed the murders, argues that the trial court and the court of appeals did not give due mitigating weight to his youth. He relies on language from *Eddings* v. *Oklahoma* (1982), 455 U.S. 104, 116, stating that "* * * the chronological age of a minor is itself a relevant mitigating factor of great weight. * * *" But the importance Cooey attaches to this dictum is inconsistent with the *Eddings* court's express refusal to usurp the weighing function of state courts. "The sentencer, and the [Oklahoma] Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence." *Eddings, supra,* at 114-115 and 117.

We do not doubt that Cooey's youth is entitled to some weight in mitigation. But we reject the notion that *Eddings* bars us from assigning it the weight we think proper. We agree with the trial court and the court of appeals that sentencing courts may distinguish between defendants of the same age on the basis of relative ex-

perience and maturity. See *State* v. *Byrd* (1987), 32 Ohio St. 3d 79, 81, 512 N.E. 2d 611, 615.

Cooey argues that the trial court and the court of appeals misapplied the standard for legal insanity to the mitigating factor created by R.C. 2929.04(B)(3). We agree. The mitigating factor existed if Cooey "* * * lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law * * *." The question was not, as the trial court thought, whether Cooey completely lacked capacity to do so. Cf. *Lawrence, supra,* at 28-29, 541 N.E. 2d at 457.

"* * * Of course, under either standard, it must be demonstrated that such lack of capacity resulted from a mental disease or defect. * * *" *State* v. *Van Hook* (1988), 39 Ohio St. 3d 256, 263, 530 N.E. 2d 883, 890. Since the trial court found that Cooey did not have a mental disease or defect, this mitigating factor would not have applied even under the correct standard.

Cooey argues that the trial court erroneously believed that he "admitted the kidnappings [and] rapes * * *." He did, of course, admit the kidnappings; however, he argues that he did not admit performing them with the purpose of engaging in sexual activity. The short answer to this is that the trial court never said he did. As for the rapes, Terry Grant testified that Cooey told him "about raping one of the women * * *." Although Cooey disputes this testimony, the trial court had every right to believe it.

Cooey argues that, since there were only two victims, it was duplicative to consider all twelve specifications from all four counts of aggravated murder. As we have said, however, it is clear that the court did not do so.

Cooey argues further that the trial court should not have considered the "other counts of Kidnapping, Rape, Robbery, and Felonious Assault[,]" since felonious assault is not an aggravating circumstance and the others were accounted for by the felony murder specifications. However, "[d]iscussion of circumstances other than statutory aggravating circumstances is not *per se* error. * * *" *State* v. *Jester* (1987), 32 Ohio St. 3d 147, 153, 512 N.E. 2d 962, 969. As in *Jester,* the trial court separately identified the aggravating circumstances in its opinion. We are persuaded that there was neither double counting nor consideration of non-statutory aggravating circumstances.

Cooey argues that the court of appeals erroneously considered the brutality of the murders as an aggravating circumstance. He argues that the concept of brutality is "vague" because any murder could be called "brutal." See, generally, *Godfrey* v. *Georgia* (1980), 446 U.S. 420. However, the court of appeals did not simply make a general assertion that the murders were "brutal." Instead, the word summarized a detailed recounting of the nature and circumstances of these murders.

Nor was the brutality of the murders used as an aggravating circumstance, as Cooey claims. Rather, the detailed description of the murders explained why, to quote the court of appeals, "[t]he three mitigating factors presented and considered here do not outweigh the aggravating circumstances." See *Steffen, supra,* at 117, 31 OBR at 278, 509 N.E. 2d at 390; *Stumpf, supra,* at 99-100, 512 N.E. 2d at 604.

Finally, Cooey argues that the appellate court erred by not considering in its proportionality review cases where the death penalty was not im-

posed, because "[n]o ruling requires the court of appeals to review only cases in which death was imposed." It is well-settled, of course, that proportionality review is *"limited* to cases already decided by the reviewing court in which the death penalty has been imposed." (Emphasis added.) *Steffen, supra,* at 123, 31 OBR at 283-284, 509 N.E. 2d at 395. Even were that question open, Cooey's reasoning—that the court of appeals was *required* to consider cases in which death was not imposed simply because "[n]o ruling" *forbids* it to do so—can only be described as absurd.

Cooey's twelfth, twenty-fifth and twenty-sixth propositions of law are overruled.

### III

Cooey's thirty-second proposition of law asserts that the aggravating circumstances here do not outweigh the mitigating factors beyond a reasonable doubt, an issue we consider as part of our statutorily mandated independent review.

Dr. James W. Siddall, a clinical psychologist, testified that he had interviewed Cooey at the Summit County Jail and performed a standard battery of psychological tests on him. According to Siddall, Cooey exhibited a "mental disorder" consisting of a "conduct disorder" and a pattern of substance abuse. Siddall explained that a "conduct disorder" is simply a pattern of refusing to obey rules and being indifferent to the rights of others. He testified that a "mental disorder" is not necessarily a "mental illness," but that it probably "would affect judgment as well as behavioral control."

Siddall also testified that Cooey's history as an abused child was significant, because those who were abused as children "have a hard time expressing their anger in any modulated way.

* * *" Finally, Siddall testified that Cooey had told him that he had used alcohol, marijuana, cocaine, and opium before committing the murders.

Cooey's mother testified in detail about the severe abuse Cooey suffered at his father's hands as a child. During Cooey's toilet training, his father punished him for "accidents" by thrusting the child's head into the toilet and rubbing his face in his soiled underwear. At meals, his father literally shoved food down Cooey's throat when Cooey refused to eat.

Cooey's mental disorder consisted of the ingestion of drugs in combination with his "conduct disorder." Dr. Siddall's definition of "conduct disorder" as a pattern of violating other people's rights could apply to virtually every criminal. As for the drug taking, no evidence suggests that it was other than voluntary. For these reasons, we give his mental disorder relatively little legal weight.

Cooey's youth is entitled to some weight, but his military status makes it reasonable to expect more maturity from him than one might otherwise expect of a nineteen-year-old. His history as a severely abused child is certainly relevant for whatever it may have contributed to his mental problems.

Although the record shows that Cooey has had contact with juvenile authorities, the record does not demonstrate any previous criminal convictions or delinquency adjudications. This factor is entitled to some weight in mitigation.

These factors tend to suggest that Cooey may have been less responsible for his acts than were most people. However, they are outweighed beyond any reasonable doubt by the aggravating circumstances of rape and kidnapping. Cooey used deceit to lure Wendy and Dawn into his car, drove them to a deserted area, then took

what he wanted from them by force. He beat them repeatedly with a nightstick, then tried to make sure Wendy was dead by strangling her.

We conclude that the properly admitted evidence overwhelmingly proves that the aggravating circumstances outweigh, beyond a reasonable doubt, the mitigating factors.

Turning to our proportionality analysis, we note that the death penalty has been upheld in numerous cases involving multiple murders, see, *e.g., State* v. *Brooks* (1986), 25 Ohio St. 3d 144, 25 OBR 190, 495 N.E. 2d 407; rape-murder, see, *e.g., State* v. *Apanovitch* (1987), 33 Ohio St. 3d 19, 514 N.E. 2d 394; and robbery-murder, see, *e.g., State* v. *Greer, supra.*

The most apposite case for comparison is *State* v. *Benner* (1988), 40 Ohio St. 3d 301, 533 N.E. 2d 701. The defendant in *Benner* was convicted of two aggravated murders involving kidnapping and rape, but not robbery. He was also convicted of a course-of-conduct specification, R.C. 2929.04(A)(5), and a felony murder specification, R.C. 2929.04(A)(7), as to each murder.

On balance, we think Cooey at least as deserving of death as Benner. We find the sentence proportionate.

The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

SWEENEY, HOLMES, DOUGLAS, H. BROWN and RESNICK, JJ., concur.

WRIGHT, J., concurs in the syllabus and judgment only.