**HORSTMAN et al., Appellants,**

v.

**FARRIS et al., Appellees.**

[Cite as *Horstman v. Farris* (1999), 132 Ohio App.3d 514.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 98–CA–64.

Decided March 5, 1999.

516

*James E. Cross, Canice J. Fogarty* and *Michael R. Pentecost,* for appellants.
*Thomas L. Czechowski,* for appellees, the Testor Corporation and Meijer, Inc.
*Stephen V. Freeze,* for appellee, Kevin Boone.
*Mark E. Stone,* for appellee, Paul R. Farris.

FAIN, Judge.

Plaintiffs-appellants, Elizabeth Horstman and her family, appeal from a summary judgment rendered in favor of defendants-appellees, Meijer, Inc., the Testor Corporation, and Kevin Boone, upon the Horstmans' complaint. This action arises from an automobile accident that occurred when the driver of another car inhaled a harmful intoxicant and proceeded to drive head-on into the car operated and occupied by the Horstman family.

The Horstmans contend that a genuine issue of material fact exists whether the intoxicant, manufactured by Testor, was a defective product and whether the defect was a proximate cause of their injuries. They further claim that the evidence shows that Meijer is liable in negligence because it sold Testor's product in violation of statute and that its negligence was proximately related to their

injuries. They next contend that Kevin Boone acted as an aider and abettor in the illegal use of the product and is therefore liable for their injuries as a result of his negligence *per se*. Finally, they claim that Boone is liable as a social host.

We conclude that even if Testor's product were defective in design, that was not a proximate cause of the injuries to the Horstmans. We conclude that Meijer was not negligent in selling the propellant to a minor without inquiring concerning his intended use of the product. We also find that Boone did not act as an aider and abettor and is not, therefore, liable under a theory of negligence *per se*. Finally, we conclude that Boone is not liable as a social host because he did not furnish the product to the tortfeasor. Accordingly, the judgment of the trial court is *affirmed*.

## I

On February 22, 1995, defendant, Paul Farris, then age sixteen, borrowed his mother's car and went to the home of his friend, Christopher Anderson. Some time after picking Anderson up, Farris drove to Meijer, Inc.'s Beavercreek store. While there, the boys purchased a can of "Ozone Safe Airbrush Propellant" manufactured by Testor Corporation. Anderson bought the propellant using a credit card that he had taken from his mother without her permission.

Once out of the store, the boys began "huffing" the propellant, *i.e.*, inhaling the propellant gasses for the purposes of "getting high." Farris then drove them to the home of Kevin Boone. The evidence indicates that Farris and Anderson went to Boone's home uninvited. When they got there, they went to Boone's bedroom. Farris and Anderson asked Boone if he wanted to huff. When Boone replied in the affirmative, Farris and Anderson demonstrated how to inhale from the canister. All three boys participated in inhaling or "huffing" from the canister; however, it is not clear from the record whether they inhaled more than once each. After approximately ten to thirty minutes, Farris and Anderson left the Boone residence and proceeded to drive east on Kemp Road; Farris was again driving.

While stopped at a red light, Farris again inhaled from the canister. When the light changed, Farris turned right and proceeded south on North Fairfield Road. Farris crossed the center-line of the road and drove into an on-coming car driven by Patricia Horstman. The collision caused injuries to Horstman and her three children, and resulted in serious brain damage to one of the children. After the collision, Farris was taken to Miami Valley Hospital, where his blood was drawn. The blood test revealed that Farris had difluoroethane, a principal ingredient of the propellant, in his system.

The Horstmans filed suit against Testor Corporation, Meijer, Inc., Kevin Boone, and Paul Farris. All of the defendants, except Farris, filed motions for summary judgment, which were granted. The Horstmans appeal from the summary judgment rendered against them.

## II

Because summary judgment is involved in each of the assigned errors addressed below, we begin with a brief discussion of the standard of review for summary judgments. Summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor. *Zivich v. Mentor Soccer Club* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, 203–204. Our review of the trial court's decision to grant summary judgment is *de novo*. *McGee v. Goodyear Atomic Corp.* (1995), 103 Ohio App.3d 236, 241, 659 N.E.2d 317, 320.

## III

In their first assignment of error, the Horstmans argue:

"The trial court erred in granting summary judgment in favor of defendant-appellee, the Testor Corporation."

The Horstmans, whose complaint against Testor was based upon a product liability claim, contend that the trial court erred by granting summary judgment on their product liability claim in favor of Testor. They contend that because the evidence shows that the propellant canister manufactured by Testor is defective in design pursuant to R.C. 2307.75, summary judgment was inappropriate. In support, the Horstmans contend that Testor had knowledge that its product was being abused, but it failed to remedy the problem in a timely manner, despite readily available methods of preventing the misuse.

In their complaint, the Horstmans contend that they are entitled to recover compensatory, punitive, and exemplary damages against Testor pursuant to the Product Liability Act of R.C. Chapter 2307.71 *et seq.* However, according to R.C. 2307.73(A), a manufacturer is subject to liability only if the claimant establishes that the product was defective *and* that the defective aspect of the product in question was a proximate cause of harm for which the claimant seeks to recover compensatory damages. Furthermore, in order to recover punitive and exemplary damages, pursuant to R.C. 2307.80, a claimant must be entitled to compensatory damages.

■ We need not reach the issue of whether the evidence supports a finding of defective design. Even if it does, we find that the trial court properly rendered summary judgment because there is no genuine issue of fact as to proximate cause, *i.e.,* Farris's conduct, rather than any defect in the product, was the proximate cause of the Horstmans' injuries.

The Horstmans have cited our opinion in *Monnin v. Fifth Third Bank of Miami Valley, N.A.* (1995), 103 Ohio App.3d 213, 658 N.E.2d 1140, for the proposition that an injury can have more than one proximate cause; in this case, they claim that the proximate causes of their injuries are Testor's product and Farris's conduct. *Monnin,* like the case before us, involved an injury caused by an individual engaged in criminal conduct. In *Monnin,* a robber held up a bank. *Id.* at 220, 658 N.E.2d at 1144–1145. During the course of the robbery, Leonard, a bank employee, told the robber that she knew his mother. *Id.* The robber subsequently shot and killed another bank employee as well as a customer. *Id.* The estates of the decedents filed suit. The trial court dismissed the claims "by summary judgment upon a finding that the [bank] had no duty to the decedents because the shootings were not reasonably foreseeable." *Id.* at 220–221, 658 N.E.2d at 1145. We reversed that decision.

We noted that the bank, having been previously robbed, knew, or should have known, that armed robbery could occur. *Id.* at 223, 658 N.E.2d at 1146–1147.[1] We then found that the bank owed a duty to the customer as an invitee to use reasonable safeguards to protect him from such reasonably foreseeable harm. *Id.* In discussing whether the customer's death was caused by the bank's deviation from a standard of conduct reasonably required by its duty of care, we noted that "[a] proximate cause is not necessarily the sole cause of the result concerned, but may be one of two or more causes which run together to produce a given result or inflict an injury." *Id.* at 224, 658 N.E.2d at 1147. We also stated:

"The intervention of a responsible human agency between a wrongful act and an injury does not absolve a defendant from liability if that defendant's prior negligence and the negligence of the intervening agency co-operated in proximately causing the injury. If the original negligence continues to the time of the injury and contributes substantially thereto in conjunction with the intervening act, each may be a proximate, concurring cause for which full liability may be imposed. Concurrent negligence consists of the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence, in producing a single indivisible injury.

---

1. Likewise, in this case, Testor knew that similar incidents involving its product had occurred in the past.

"In order to relieve a party of liability a break in the chain of causation must take place. A break will occur when there intervenes between an agency creating a hazard and an injury resultïng therefrom another conscious and responsible agency which could or should have eliminated the hazard. However, the intervening cause must be disconnected from the negligence of the first person and must be of itself an efficient, independent, and self-producing cause of the injury." (Citations omitted.) *Id.* at 224, 658 N.E.2d at 1147.

In *Monnin,* we noted that the robber's act was intentional and was thus "a conscious and responsible agency which could and should have eliminated any hazard to [the customer] from the bank's breach of its duty of care." *Id.* at 225, 658 N.E.2d at 1148. However, evidence was presented that the statement by Leonard regarding the robber's mother "was the kind of statement which raises a concern in the criminal that he can be identified and connected to his crime, increasing the prospect of violence by him and contributing to the shootings in [the] case." *Id.* at 224, 658 N.E.2d at 1147. There was also evidence that bank employees were instructed to avoid making this kind of comments to bank robbers. However, Leonard testified that she had never been instructed to avoid this kind of comment. *Id.* at 225, 658 N.E.2d at 1147–1148. Therefore, we found summary judgment inappropriate because reasonable minds could find that the robber's decision to shoot was prompted by Leonard's negligence, vicariously attributable to her employer bank, in making the comment. *Id.*

In the case before us, the record shows that Farris knowingly, intentionally, and willfully misused the product in an illegal manner that he knew was dangerous. He not only abused the product but he did so while driving a vehicle, despite his knowledge that the product caused intoxication. He also proceeded to drive that vehicle while intoxicated from huffing, although he testified that he knew that he was not capable of driving at that time. Testor did not prompt the criminal act. Thus, Farris's purposeful misuse of the product, in a manner for which it was clearly not intended, is enough to break the chain of causation between the alleged defect and the injuries to the Horstmans.

We can envision a situation in which the injuries to a third-party bystander, who has not used a product, are nevertheless proximately caused by a defect in the product. For instance, if a driver of an automobile were to lose control of the car on a city street, as a result of a steering defect, causing the car to run into and injure pedestrians, the injuries to the pedestrian would be proximately caused by the defect. However, the situation in the case before us is more akin to a claim that, because a drunken consumer drives a car at one hundred forty m.p.h. in a downtown area crowded with pedestrians, and negligently collides with several pedestrians, the car is a defective product. In that scenario, the injuries to the pedestrians crowd were clearly not caused by the car's ability to

reach an unsafe speed but by the reckless, unlawful conduct of the driver. Likewise, the injuries to the Horstmans were not caused by the product but rather by Farris's willful, reckless, and unlawful conduct.

We therefore conclude that the trial court did not err in granting summary judgment in favor of Testor. The Horstmans' first assignment of error is overruled.

## IV

The Horstmans' second assignment of error asserts:

"The trial court erred in granting summary judgment in favor of defendant-appellee, Meijer, Inc."

The Horstmans contend that the trial court erred by granting summary judgment in favor of Meijer, Inc. In support, they argue that Meijer violated R.C. 2925.32 by selling the airbrush propellant to Farris and Anderson. They argue that the violation of the statute constitutes negligence *per se.*

The parties apparently concede that the airbrush propellant is a "harmful intoxicant" as defined in R.C. 2925.01(J). Dispensing or distributing such intoxicants to juveniles is prohibited by R.C. 2925.32, which provides:

"(A) No person shall knowingly dispense or distribute any harmful intoxicant, except gasoline, to any juvenile, if the person who dispenses or distributes it knows or has reason to believe that the harmful intoxicant will be used in violation of section 2925.31 [abusing harmful intoxicants] of the Revised Code, unless a written order from the parent or guardian is provided to the dispenser or distributor."[2]

The Horstmans contend that the evidence creates a genuine issue of fact whether Meijer had reason to believe that the airbrush propellant would be abused by the boys. The evidence to which the Horstmans refer us includes the following: (1) the boys made only one purchase—a large canister of propellant, (2) the boys did not purchase any of the "attachments or accouterments" with which to use the contents of the canister, (3) the cashier did not have any conversation with the boys concerning their age or their intended use for the product, (4) the cashier permitted the boys to use a credit card that was not theirs.

In regard to the fact that the boys purchased only the one item, it appears that the Horstmans want us to declare that any attempt by a juvenile to purchase a

---

2. R.C. 2925.32 has been amended since the date of the accident in this case. The version of the statute to which we refer is the one in effect at the time of the sale to Farris and Anderson.

product that is defined as a harmful intoxicant, but not designed or intended for use as a harmful intoxicant, is, by itself, enough to cause a retailer to have a reason to believe that the product will be abused. We cannot agree with this. This construction of the statute would render the sale of any product falling into the definition of a harmful intoxicant a strict liability offense. Clearly the General Assembly, by the use of the phrase "knows or has reason to believe," intended to include a culpable mental state in the statute.

Pursuant to R.C. 2925.01(J), nail polish remover is also defined as a harmful intoxicant. We cannot believe that the General Assembly intended to impose liability upon retailers every time a teenage girl buys nail polish remover. Obviously, nail polish remover has the potential for abuse; however, there is also a legitimate use for the product that is not related to "getting high." The mere fact that a juvenile is buying the product is not enough to create a reason to believe that the product will be abused. Likewise, the product sold in this case, which was intended to be used with an airbrush to propel a medium, such as paint, through an airbrush, can be used for purposes other than inhalant abuse. In fact, the record reveals that at the time of purchase, when the boys were in line at the check-out counter at Meijer, they were discussing painting a model plane, a legitimate use of the product.[3]

Furthermore, had the General Assembly intended R.C. 2925.32 to impose liability upon a retailer based solely upon the sale of a defined harmful intoxicant, it could have expressly provided therefor. For example, the legislature has made the sale of alcohol to minors a strict liability offense, *i.e.*, the mere fact of sale to a minor is enough to impose liability. See R.C. 4301.69(A); *State v. Spicer* (Mar. 30, 1994), Greene App. No. 93 CA 55, unreported, 1994 WL 102097. The General Assembly could have made criminal any sale of any harmful intoxicant to a minor. Since we conclude that the statute does not provide for imposing liability upon a retailer based upon the mere sale of a product to a juvenile, we cannot conclude that the fact that the boys made only one purchase is enough to find that Meijer had a reason to believe that the product would be abused.

Next, the Horstmans contend that because the boys did not purchase any accessory items with the canister, Meijer had reason to believe that the product would be abused. According to the Horstmans, Testor's Ozone Safe Airbrush Propellant "is a product marketed with an intended use as a carrying agent for

---

3. We note that the trial court's decision was based, in part, upon the assumption that the Meijer cashier overheard this conversation between Farris and Anderson in the check-out line. However, nothing in the record suggests that the clerk overheard this conversation. Therefore, this finding is erroneous because it relies upon an inference—that the clerk overheard the conversation—that is not compelled by the evidence in the record, and therefore cannot be relied upon to support summary judgment.

paints" and the canister does not have a mechanism to activate the spraying system as "would be found on a normal aerosol paint can." Therefore, they claim that in order to use the contents of the canister, the user "must utilize a kit which attaches to the canister and allows the gas to exit the can." Finally, the Horstmans contend that "the legitimate user would also require a paint source to be applied by the aerosol." The record does not support this argument. Instead, the record supports a finding that the can of propellant can be sold either as part of kits that include an airbrush, or can be sold separately to those who already own an airbrush and merely need a new can of propellant for use with the airbrush. Moreover, there is no evidence in the record that the product has to be sold with a paint source. Therefore, in the absence of any evidence to indicate that Meijer had reason to believe that Farris and Anderson did not already have either the airbrush or a paint source, this argument fails.

The Horstmans also refer to the fact that the cashier did not ask the boys about their ages or their intended use of the product. They contend that the failure to do so imposes liability upon Meijer, Inc. In fact, the Horstmans contend that the abuse of these propellants for huffing is of such growing concern nationwide that the statute must be read as imposing a minimal duty of inquiry upon retailers. They claim that to do otherwise would render R.C. 2925.32 meaningless.

■ We cannot agree. The statute contains no requirement that retailers either check the identification of anyone who appears to be a minor, or that it inquire concerning the minor's intended use of the product. Again, had the General Assembly intended to impose a duty of inquiry upon retailers, it could have expressly so provided; or it could have encouraged inquiry by establishing it as an affirmative defense to a charge under this statute. See R.C. 4301.639 (under certain circumstances, checking the identification of a minor is an affirmative defense to a charge of selling alcohol to a minor). In the absence of an express requirement in the statute, we decline to impose a general duty of inquiry upon retailers.

Next, the Horstmans contend that Meijer had reason to believe that the boys would abuse the product because they made the purchase using a credit card that they had stolen from Anderson's mother. We do not relate the use of a credit card in making a purchase with a conclusion that the product purchased therewith will likely be abused. We assume that it is not uncommon for minors to use their parents' credit cards, with permission, to make purchases. Even if it were assumed that Anderson did not have his mother's permission, that would not suggest that he had an illicit purpose for his purchase. To the contrary, if he had wanted to conceal the fact of the purchase from his mother, he would have been more likely to have paid with cash.

The evidence in the record does not support a finding that Meijer had reason to believe that the product purchased would be abused by Farris and Anderson. Therefore, we conclude, albeit on different grounds, that the trial court did not err by rendering summary judgment in favor of Meijer.

Accordingly, the second assignment of error is overruled.

## V

The third assignment of error is as follows:

"The trial court erred in granting summary judgment in favor of defendant-appellee, Kevin Boone."

The Horstmans contend that the trial court erred by rendering summary judgment in favor of Kevin Boone. They argue that Boone is liable under the "social host" theory because he permitted a minor to consume an illegal intoxicant in his residence. They further argue that Boone aided and abetted Farris in criminal activity by participating in the huffing and by permitting Farris to use the intoxicant in his home. Thus, they argue that Boone, by aiding and abetting Farris in criminal conduct in violation of R.C. 2925.31 (abusing harmful intoxicants), is liable for the injuries to the Horstmans.[4]

We begin with the issue of whether Boone is liable under the "social host" theory. The social host theory was established by the Ohio Supreme Court in *Settlemyer v. Wilmington Veterans Post No. 49* (1984), 11 Ohio St.3d 123, 11 OBR 421, 464 N.E.2d 521, which held that a social provider of intoxicating beverages cannot be held liable to a third person subsequently injured by the intoxicated person. Subsequently, the court found potential liability in a social host for injuries to a third person when the host served alcohol to a minor. *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 526 N.E.2d 798. The court made a point to distinguish *Settlemyer* by indicating that in *Mitseff* the social host committed a statutory violation by *furnishing* alcohol to a minor in violation of R.C. 4301.69. *Mitseff* at 114, 526 N.E.2d at 800–801. "Furnishing [alcohol] to underage persons violates R.C. 4301.69 and is negligence *per se*." *Huston v. Konieczny* (1990), 52 Ohio St.3d 214, 218, 556 N.E.2d 505, 509–510. The crucial factor leading to liability is that the social host *furnished* the alcohol.

---

4. The Horstmans also claim that the three boys worked together to use the canister by prying it open for each other. This is a mischaracterization of the evidence. The evidence does indicate that Farris and Anderson showed Boone how to use the canister. However, there is no indication in the record that the boys had to physically aid each other in inhaling from the canister. In fact, the only evidence regarding this fact is Boone's testimony that no one helped him to use the canister and that he did not help either Farris or Anderson in their use of the canister.

The Horstmans contend that it is not necessary that the social host furnish the intoxicant to the minor in order to be liable. They cite *Huston v. Konieczny, supra,* for the proposition that liability can attach when the social host knows of the wrongdoing and consents to it. In *Huston,* the Cordell children hosted a party at their parents' home while their parents were out of town. *Id.* at 215, 556 N.E.2d at 506–507. The Cordell parents had given their children permission to throw the party and knew that the children "probably would have some beer." *Id.* After imbibing at the party, two minors, Huston and Bodnar, were involved in a car accident; Bodnar was driving. Huston later sued the Cordells. *Id.* The trial court rendered summary judgment in favor of the Cordell family. *Id.* at 215, 556 N.E.2d at 506–507. The court of appeals reversed. *Id.* at 216, 556 N.E.2d at 507–508.

In affirming the court of appeals, the Supreme Court made a determination whether the Cordell parents could be held liable for Bodnar's intoxication. The court noted that although at common law a parent is not ordinarily liable for damages caused by a child's wrongful conduct, "liability can attach when the injury committed by the child is the foreseeable consequence of a parent's negligent act." *Id.* at 217, 556 N.E.2d at 509. The court then held that the Cordell parents were responsible for their children's conduct because they knew of the wrongdoing and consented to it. *Id.* at 218, 556 N.E.2d at 509–510. The finding of parental liability did not focus on the social host theory but rather on the "abdication of parental responsibility" and "an authorization by the Cordell parents to their children to furnish intoxicants to others in violation of Ohio statutory law." *Id.*

The Horstmans argue that Boone "stands in a position not unlike the Cordell parents" because he consented to and sanctioned the huffing in his residence. We disagree. First, the liability of the Cordell parents arose from their negligent conduct; they were negligent because they knew that their children would *furnish* alcohol and they consented to, and sanctioned, such behavior. Thus, the finding of negligence did center on who furnished the alcohol to a minor. Second, Boone is a minor and thus cannot be held to the same standard as adults. Furthermore, he did not have parental responsibility for Farris and Anderson. Third, we find Boone's position to be more closely aligned with that of the Cordell children. The court specifically declined to address whether the Cordell children could be held accountable for furnishing alcohol to minors. *Id.* at footnote 3. Again Boone did not supply the intoxicant in the case before us.

We reject the social host theory of liability because Boone did not dispense or distribute a harmful intoxicant to Farris in violation of R.C. 2925.32.

We next address the issue of whether Boone, pursuant to R.C. 2923.03(A)(2), aided and abetted Farris in violating R.C. 2925.31 (abuse of the intoxicants), and,

if so, whether that conduct constitutes negligence *per se*. Since there is no evidence that Boone physically aided Farris in his abuse of the intoxicant, we must determine whether Boone aided and abetted by (1) failing to object to Farris's use of the intoxicant in his home or (2) abusing the intoxicant himself.

R.C. 2923.03(A) provides, in part, that "no person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) aid or abet another in committing the offense." Although the phrase "aid and abet" is not defined in the statute, Ohio courts have consistently held that "aid" means to assist and "abet" means to incite or encourage. *State v. Sims* (1983), 10 Ohio App.3d 56, 58, 10 OBR 65, 67–68, 460 N.E.2d 672, 674–675. "Mere association with the principal is not enough." *Id.* Furthermore, "[m]ere approval or acquiescence, without expressed concurrence or the doing of something to contribute to an unlawful act, is not an aiding or abetting of the act." (Citation omitted.) *State v. Stepp* (1997), 117 Ohio App.3d 561, 568, 690 N.E.2d 1342, 1347. "Without previous connection with the transaction, one is not an aider and abettor unless he knowingly does something which he ought not to do, or omits to do something he ought to do, which assists or tends in some way to affect the doing of the thing which the law forbids; in order to aid or abet, whether by words, acts, encouragement, support or presence, there must be something more than a failure to object unless one is under a legal duty to object." *Id.* at 569, 690 N.E.2d at 1347.

The first question is whether Boone aided Farris in his use of the intoxicant. The record shows that Farris came to Boone's house uninvited and that he huffed from the canister without any physical help or assistance from Boone. The mere fact that Farris huffed while in Boone's home is not enough to give rise to liability as an aider, since merely being present when a crime is committed does not constitute aiding. Furthermore, there is no evidence that Boone had a legal duty to object to Farris's conduct; however, we note that the record supports a finding that Boone did in fact make an objection.[5] Thus, we conclude that the evidence does not support a finding that Boone aided Farris in his illegal conduct.

The question then remains whether Boone is liable as a criminal abettor for inciting or encouraging the activity. The Horstmans contend that by participating in the huffing, Boone encouraged the activity. The Horstmans fail to cite any authority for this proposition, but our research revealed a case in which a defendant was found criminally liable as an abettor for participating in an activity

---

5. Farris testified that Boone told him to stop huffing in his bedroom, at which time the boys quit.

with his friend. *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895. In *Cooey,* the defendant and his friends were engaged in throwing rocks from an overpass onto a highway. *Id.* at 20, 544 N.E.2d at 901. One of the defendant's friends hit a car with a rock, causing an accident, and all of the men were charged with felonious assault. *Id.* at 22, 544 N.E.2d at 902–903. The defendant claimed that he was not guilty of the charge because he did not drop the rock that actually hit the car. *Id.,* at 25, 544 N.E.2d at 905. The Ohio Supreme Court held that it could be reasonably inferred that by taking part in the rock throwing, the defendant encouraged his friend to continue throwing things off the bridge. *Id.* The court held that the evidence of participation supported a finding of criminal liability as an abettor. *Id.* The court also held that a trier of fact could reasonably find that the defendant knew that dropping rocks from the bridge would probably cause physical harm to people below, and thus, the defendant possessed the requisite culpable mental state for felonious assault. *Id.*

At first blush, *Cooey* would seem to support a finding that Boone was guilty as an abettor. However, we find the facts in *Cooey* to be distinguishable from those in this case. In *Cooey,* the friends were engaged in a common activity together. It could be said that the friends exhibited mutual enthusiasm for the activity, and there was no showing that any one friend urged the other into participating in the activity. Conversely, in this case Farris and Anderson had already engaged in huffing. There is no evidence that Boone incited the activity. To the contrary, Farris and Anderson incited the activity when they entered Boone's bedroom by asking him if he wanted "to hit the can," and by demonstrating how to use the propellant. We find that merely acquiescing in an ongoing criminal activity, without more, does not constitute abetting another's participation in that activity. Thus, we conclude that the record does not support a finding that Boone abetted by inciting or encouraging an illegal action.

Moreover, even if Boone had aided and abetted Farris, thereby subjecting himself to liability for negligence, we would still conclude that the Horstmans' injuries were not proximately caused by Boone's conduct. "Even though the law may presume negligence from a person's violation of a statute, the law does not, from that presumption alone, presume that such negligence was the proximate cause of the injury." 70 Ohio Jurisprudence 3d (1986), Negligence, Section 36. "Negligent conduct is the 'proximate cause' of an injury if the injury is the natural and probable consequence of the conduct." *Reed v. Weber* (1992), 83 Ohio App.3d 437, 441, 615 N.E.2d 253, 255. "An injury is the natural and probable consequence of negligent conduct if the injury might and should have been foreseen." *Id.* "An injury is foreseeable if a reasonably prudent person, under the same or similar circumstances, would have anticipated that injury to another was the likely result of his conduct." *Id.*

The evidence in this case reveals that Farris testified that the "high" from inhaling lasted anywhere from thirty to forty-five seconds. The evidence also shows that when he left Boone's house, Farris did not feel "giddy," "light-headed," intoxicated or high. Farris testified that he subsequently huffed from the canister while sitting in his car at a red light, and that he started to feel light-headed and dizzy. He began to drive his car before the high wore off, even though he knew he was in no condition to drive. Farris admitted that he was driving the car within the thirty to forty-five seconds that he knew the huffing would affect him.

The Horstmans submitted the deposition of a toxicologist who averred that at the time he huffed at the red light, Farris had "residual toxicant" in his system from huffing fifteen minutes prior to the collision (a time period when he was allegedly at Boone's house). The toxicologist further averred that the residual toxicant contributed to his loss of consciousness, resulting in the collision.

Even if there was residual toxicant in Farris's system that contributed to his alleged blackout, we find the activity at Boone's home too remote to be related to the collision. There is no evidence in the record to suggest that Farris would have been involved in the subject accident absent the huff at the red light. The fact that Farris huffed at the red light was not a consequence of huffing at Boone's house, nor was it under Boone's control. Boone could not reasonably foresee that Farris would huff while in his car or that Farris would drive during the period of intoxicant high. Therefore, we find that the activities at Boone's house were not a proximate cause of the subsequent accident.

The Horstmans' third assignment of error is overruled.

## VI

All of the Horstman's assignments of error having been overruled, the judgment of the trial court is *affirmed*.

*Judgment affirmed.*

WOLFF, J., concurs.

GRADY, P.J., concurs in judgment only.

The trial court granted summary judgment for Testor Corporation ("Testor") on the Horstmans' claim for relief, holding that Testor's alleged negligence was not a proximate cause of the harm the Horstmans suffered. I do not agree. Proximate cause exists in the causal relationship between events, and on this record Testor's failure to add an adulterating ingredient to its aerosol propellant was causally connected to the harm the Horstmans suffered. However, Testor is

not legally liable for that harm unless the harm was reasonably foreseeable to Testor.

Pursuant to R.C. 2307.75(B)(1), "a manufacturer may be liable for failing to use a feasible alternative design that would have prevented harm caused by an unintended but reasonably foreseeable use of its product." *Perkins v. Wilkinson Sword, Inc.* (1998), 83 Ohio St.3d 507, 513, 700 N.E.2d 1247, 1252. The Horstmans concede that "huffing" was an unintended use of Testor's aerosol propellant. However, on this record, it was a reasonably foreseeable use, and Testor had a feasible design alternative that could have avoided it. Therefore, Testor may be liable to any person or persons harmed as a result if Testor had a duty to protect them from such harm.

Intervention of a conscious and responsible human agency between a prior negligent act and an injury absolves the prior actor of liability for any negligence on his part to persons who are injured as a proximate result of that negligence when the agency could or should have eliminated the hazard involved. That is generally the case when the intervening agency involves commission of a wrongful act. However, the prior actor may yet be held liable if it had a specific duty to protect those injured from the harm that occurred. *Monnin v. Fifth Third Bank of Miami Valley, N.A.* (1995), 103 Ohio App.3d 213, 658 N.E.2d 1140.

In *Monnin, supra,* we found that a regulation requiring installation of alarms created a specific duty in the defendant bank, which it had breached. Because that specific duty operated to the benefit of the customers who entered the bank, we held that the bank may be liable to customers who were harmed by a bank robber when the harm proximately resulted from the bank's breach of duty.

Here, Testor had no specific duty to protect the Horstmans or passersby from harm resulting from a purchaser's misuse of Testor's product. In contrast to *Monnin, supra,* no statute or regulation required Testor to add an adulterating ingredient to its product. Therefore, no similar breach of duty is demonstrated.

The point of distinction between proximate cause and foreseeability is elusive, but important. Foreseeability is an element of duty, which exists in the relationship between people and results by operation of law. Proximate cause exists in the relationship between events, and is a question of fact. Therefore, the existence of proximate cause generally cannot be resolved on a motion for summary judgment, which the trial court did here. The existence of a legal duty may be thus resolved, however. On this record, the proper basis on which to grant the motion is a finding of lack of legal duty, not failure of proximate cause.

I would overrule the first assignment of error on the foregoing basis.