OPINION
On the evening of November 15, 2000, Doris Strode was working alone at the Union Station Drive-Thru. At approximately 6:00 p.m., Ms. Strode was stocking the beer cooler and she had taken the cordless phone with her when she left the office. She kept the door open so that she could see if people came through because she could not hear the alarm from the cooler.
While stocking the cooler, Ms. Strode looked up and saw two people enter the office of the store. Ms. Strode described one of the persons as a black male with a blue and white bandana that he was holding to his face with one hand and in the other hand he had a dark object. Ms. Strode immediately called 911 and told the operator where she was and that she was being robbed. However, she was disconnected from the operator. Panicking, Ms. Strode called her mother and kept her on the phone.
Soon, a customer came to the drive thru. Ms. Strode exited the beer cooler through the opposite door and approached the vehicle. Frantic, Ms. Strode attempted to open the passenger door of the unsuspecting customer's truck and enter it. While she was trying to enter the passenger door, a man named Jack Shepherd approached her and asked for change for a dollar. Ms. Strode told the customer in the truck that she was being robbed and asked him to stay with her. The customer agreed to stay. Ms. Strode took the customer's order and asked him to pull forward because an alarm was sounding in the drive-thru office due to the truck's location which concerned Ms. Strode because she had seen two strangers enter the office.
Meanwhile, Deputy Gardner had heard the dispatch about the robbery and responded. The deputy parked his cruiser down the street and walked to the drive thru because he saw Mr. Shepherd standing in the entranceway and did not want to create chaos. The deputy observed that Mr. Shepherd was looking up and down the street as if looking out for customers. Deputy Gardner told Mr. Shepherd to get on the ground and he handcuffed him. While securing Mr. Shepherd, Deputy Gardner observed Mr. Brown run out from behind the potato chip rack. Deputy Gardner ordered Mr. Brown to stop but instead he turned around and ran back behind the potato chip rack. After several orders by the deputy for Mr. Brown to come out, Mr. Brown finally complied and Deputy Gardner secured him. By this time, other police crews had arrived at the drive-thru. A blue bandana and a .38 pistol were found around the potato chip rack, where Mr. Brown had been hiding.
When the police officers went to talk to Ms. Strode, who was at the cash register in the office, Deputy Harvey observed movement behind a door to the back storage area, where the cigarettes, petty cash and a security camera were stored. Ms. Strode told the deputy that no one should be in the back storage area. When the Deputy opened the door, he found Amanda Lynn carrying a black bag over her shoulder. The black bag contained several cartons of cigarettes and the security camera tape from the drive-thru. During the investigation, it was revealed that Ms. Lynn used to work for the drive-thru, but had been fired because she was suspected of stealing.
On December 18, 2000, Mr. Brown was indicted by the State of Ohio (hereinafter "State") on one count of robbery in violation of R.C.2911.02(A)(1). On March 21, 2001, a jury trial was held and the jury found Mr. Brown guilty shortly thereafter. On April 25, 2001, Mr. Brown was sentenced to a four-year term of incarceration. Mr. Brown has filed this appeal from the conviction.
Mr. Brown raises the following as his sole assignment of error:
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ENTERING A VERDICT OF GUILTY, WHICH VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW.
 Mr. Brown argues that the evidence presented by the State failed to prove beyond a reasonable doubt that he was in complicity with Ms. Lynn to commit a theft and that he had a gun on his person or under his control. We disagree.
This Court has previously stated the following standard when addressing a manifest weight of the evidence challenge:
 A weight of the evidence argument challenges the believability of the evidence, and asks which of the competing inferences suggested by the evidence is more believable or persuasive. State v. Hufnagle (Sept. 6, 1996), Montgomery App. No. 15563, unreported. The proper test to apply to that inquiry is the one set forth in State v. Martin (1983), 20 Ohio App.3d 172, 175:
 [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and new trial ordered.
 This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the factfinder lost its way. State v. Bradley (October 2, 1997), Champaign App. No. 97-CA-03, unreported.
 State v. Golson (March 9, 2001), Montgomery App. No. 17707, unreported. Moreover because the jury had the opportunity to see and hear the witnesses who testified and observe their demeanor, it is up to the jury to resolve conflicts in the evidence, particularly in determining which witnesses to believe and the weight to give their testimony. State v. DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366.
In the case against Mr. Brown, the State presented evidence that Mr. Brown was in complicity with Ms. Lynn to commit a theft. Mr. Brown argues that he did not commit a theft and that there was no evidence that he was acting in complicity with Ms. Lynn. Mr. Brown points to the fact that he was not found with any item from the drive-thru and further that he made no statements or physical conduct which indicated he was involved in the theft. However, at trial Ms. Strode testified that she saw Mr. Brown entering the office of the drive-thru with another person and specifically stated that no one other than herself should have been in the office. Moreover, when Mr. Brown was entering the office he was holding a bandanna over his face which is indicative of a person trying to disguise himself. Additionally, the robbery statute does not require that Mr. Brown participated in a completed act of theft, but merely an "attempted" theft offense.
Also, the jury could have found that Mr. Brown acted in complicity with Ms. Lynn and Mr. Shepherd in committing the offense. Ohio's complicity statute, R.C. 2923.03(A)(2), provides, "no person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * [a]id or abet another in committing the offense." Ohio courts have defined "aiding and abetting" as assisting, inciting or encouraging. Horstman v. Faris (1999), 132 Ohio App.3d 514, 527, certiorari denied (1999), 86 Ohio St.3d 1421. In order to convict a defendant as an aider and abettor, "it must be proven beyond a reasonable doubt that he advised, hired, incited, commanded, or counseled the principal to do the act * * * or [had] some preceding connection with the transaction," i.e., one does not aid and abet if he merely sees a crime being committed. State v. Starr (1980), 24 Ohio App.2d 56, 58, 53 O.O.2d 167. Ms. Lynn was found in the private back storage area of the drive-thru, and on her person she had several cartons of cigarettes and the drive-thru's security videotape. The manager of the drive-thru testified that he inventoried the drive-thru that night and the same cartons of cigarettes that were found on Ms. Lynn were missing from the drive-thru. Additionally, the manager testified that before he left that evening the videotape was in the security camera and after the incident it was missing. Therefore the weight of the evidence clearly demonstrated that Ms. Lynn was engaged in an attempted theft at the drive-thru. A jury could certainly have concluded from Mr. Brown's behavior, particularly hiding his face with a bandanna and going into the private office of the drive-thru with someone else, that he was aiding and abetting Ms. Lynn and Mr. Shepherd in an attempted theft at the drive-thru. Therefore, we cannot find that the jury lost its way in finding beyond a reasonable doubt that Mr. Brown committed a theft offense.
Also, Mr. Brown argues that the jury's finding that he had a weapon in his possession or control was against the weight of the evidence. The State presented the testimony of Ms. Strode that she saw Mr. Brown enter the office with a dark object in his hand and a blue and white bandana held up to his face. Further, when Deputy Gardner arrived Mr. Brown hid behind a potato chip rack and only came out after repeated orders by the deputy. When the deputy looked behind the potato chip rack in the area where Mr. Brown was hiding, he found a gun and the blue and white bandanna. When the gun was tested for fingerprints, four prints were retrieved but only one print was good enough to match and that fingerprint, which was on the magazine of the gun, matched Mr. Shepherd. A juror could reasonably conclude from this that Mr. Shepherd merely loaded the magazine into the gun for Mr. Brown. Moreover, the expert testimony clarified that the gun was of a non-porous nature and therefore fingerprints could be easily wiped away. Based on this evidence, we cannot say that the jury lost its way and created a manifest miscarriage of justice. On the contrary, we find that the weight of the evidence supports the jury's conclusion that Mr. Brown had possession or control over a gun during the commission of the theft.
Mr. Brown's assignment of error is without merit and is overruled. The judgment of the trial court is affirmed.
BROGAN, J. and FAIN, J., concur.