OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Ronnie E. Foreman, filed August 23, 2007. On February 26, 2007, Foreman was indicted by a Montgomery County Grand Jury on five counts of gross sexual imposition (13), in violation of R.C. 2907.05(A)(4), felonies of the third degree, and one count of importuning, in violation of R.C. 2907.07(A), a *Page 2 
felony of the fourth degree. The victim is Foreman's then ten year old stepdaughter. Foreman entered a plea of not guilty on March 1, 2007, and on March 21, 2007, he filed a motion to suppress, arguing that he was not advised of his Miranda rights and that statements he made were not given voluntarily. Following a hearing, the trial court overruled Foreman's motion on April 10, 2007. On May 22, 2007, Foreman pled no contest to the charges against him, and he was found guilty. He received a total sentence of nine years.
 {¶ 2} The following witnesses testified at the hearing on the motion to suppress: James E. Combs, Jr., a City of Dayton police officer who took an initial report from the victim's mother; City of Dayton police detective Phillip W. Olinger, who interviewed Foreman at the police department; City of Dayton police detective Jo Quinn Smith, who is assigned to the Special Victims Unit and who interviewed the victim and her mother at CARE House and also participated in Olinger's interview of Foreman; and Foreman.
 {¶ 3} Combs testified that he was dispatched to the residence of the victim's grandmother on the report of a "sexual attack." The victim's mother was there and she told Combs that her daughter reported that Foreman had molested her approximately ten times beginning in August of 2006. Combs later located Foreman at his residence, and he placed Foreman under arrest. Combs advised Foreman of his rights and that he was being arrested for gross sexual imposition, a felony. Combs directed a crew to transport Foreman to the county jail for questioning by the investigating detective. Combs testified that Foreman did not ask for a lawyer or make any statements.
 {¶ 4} Olinger testified that Smith asked him to interview Foreman. At the police department, Olinger told Foreman he was being interviewed regarding allegations of gross *Page 3 
sexual imposition, and he advised Foreman of his rights by means of the police department's standard pre-interview form. The pre-interview form was admitted into evidence, and Foreman signed his name at the top of the form where his rights are enumerated, and he also signed the waiver of rights section at the bottom of the form. (State's exhibit 1). Foreman stated that he did not do anything to the victim, and Olinger told him that he believed that DNA matching Foreman's had been found in the victim's jeans, which was untrue. Olinger then left Foreman alone in the interview room for 10 minutes.
 {¶ 5} Olinger testified, upon his return, that he "threw some questions out and [Foreman] stated that he * * * only did rub his penis on the girl's upper thigh and rub it on her bottom." Foreman indicated that he did not want to write out a statement. Based upon Foreman's remarks, Olinger wrote down five questions for Foreman to answer and initial as follows: 1) "Did you hit [the victim]?" Foreman wrote, "no," and placed his initials by his answer; 2) "Did your penis go into her vagina?" Foreman wrote, "no," and placed his initials by his answer; 3) "Did your penis go into her butt?" Foreman wrote, "no," and placed his initials by his answer; 4) "Did you only rub your penis on her upper thigh?" Foreman wrote, "yes," and placed his initials by his answer; and 5) "Are you sorry for touching on [the victim]?" Foreman again wrote, "yes," placed his initials by his answer, and he signed the bottom of the sheet of paper. (State's Exhibit 2). Olinger stated that Foreman never asked to stop the interview or to speak with an attorney, and that he never indicated to Foreman that a plea agreement could be worked out with the prosecutor. According to Olinger, the interview lasted about 50 minutes, including the ten minute break.
 {¶ 6} Smith was present for the end of the interview. According to Smith, Foreman *Page 4 
"stated that the complaining witness had come into his room and touched his penis, and that the complaining witness had been curious and that this only happened a few weeks ago. And that he had rubbed his penis against her thigh and her behind, * * * ." Smith stated that the victim told her "that since August of 2006, that he had been coming into her room or had her come into his room, and he had taken her clothes off or had her take her clothes off. And he would take his clothes off and he would get on top of her and place his penis on top of her vagina and rub her until he ejaculated, and that sometimes he would stand behind her and place his penis between her legs until he touched her vagina, and he would have it in his hand and he would rub her until he ejaculated."
 {¶ 7} Foreman testified that he is 53 years old and a graduate of Colonel White High School. According to Foreman, he asked for an attorney at the start of the interview with Olinger, and Olinger told him he "wasn't going to need no public defender, they can't do nothing for me, that I was a baby-raping mother-fucker and that I didn't deserve no lawyer." Foreman testified that Olinger told him "he was going to talk to the prosecutor, and the prosecutor and him were real good friends, and see what kind of deal I can get." Foreman stated that Olinger left the interview room three or four times. Foreman testified that he told Olinger that he did not want to return to the penitentiary, having already spent more than 20 years in prison, and that Olinger stated, "for the child's sake and my sake, he was going to talk to the prosecutor again. And the last time he came back, he said, `Well, * * * the prosecutor said you can do six months to a year." Foreman stated that when Olinger presented him with the five questions, Olinger told him, "the judge wasn't going to accept no plea bargain if I said `no' to everything. I had to say something, I had to accept some type of responsibility or something, or *Page 5 
the judge wouldn't accept the plea bargain."
 {¶ 8} According to Foreman, he initially wrote "no" to all of the questions, but then he changed his answer to the fourth question to "yes," based upon Olinger's remarks about accepting responsibility for something in exchange for leniency. According to Foreman, Olinger said, "I'm supposed to rub my penis on her thigh. I had initially wrote "no" there. He said, `Well, this is the easiest one on here." Foreman testified, "the last time [Olinger] came in with Detective Quinn is when he came in with the rights sheets," after Foreman answered the five questions, and that at that time Foreman believed that he and Olinger had already negotiated a six-month to a year plea agreement.
 {¶ 9} In response to questions from the trial court, Foreman indicated that he knew that there was no DNA evidence in the victim's clothing because "we didn't do anything like that."
 {¶ 10} Foreman asserts one assignment of error as follows:
 {¶ 11} "THE TRIAL COURT ERRED IN OVERRULING HIS MOTION TO SUPPRESS AND FINDING THAT THE STATEMENTS WERE VOLUNTARILY MADE AFTER KNOWINGLY AND INTELLIGENTLY WAIVING ALL CONSTITUTIONAL RIGHTS THAT HAD BEEN TIMELY ADVISED BY THE POLICE."
 {¶ 12} "Appellant courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's *Page 6 
ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." State v. Purser, Greene App. No. 2006 CA 14, 2007-Ohio-192, ¶ 11.
 {¶ 13} Foreman relies upon State v. Farris, 109 Ohio St.3d 519,849 N.E.2d 985, 2006-Ohio-3255. Farris involved a "question-first scenario," in which a State trooper questioned Farris, who had been stopped for speeding, whose vehicle smelled of marijauana, and who had been placed in the front seat of the trooper's cruiser, before advising him of hisMiranda rights. After Farris admitted that there was a marijuana pipe in the trunk of the car, the trooper administered Miranda warnings. The trooper then again asked Farris about the drug paraphernalia and obtained the same response. Following a search of the trunk, the pipe and cigarette papers were seized, and Farris was charged with possession of drug paraphernalia, a misdemeanor.
 {¶ 14} Farris filed a motion to suppress the statements made to the trooper and the evidence seized from the trunk of his car. The trial court determined that the statements made prior to the Miranda warnings should be suppressed, but that the statements made after the warnings were given were admissible, along with the evidence taken from the trunk. Farris pled no contest, was convicted, and the trial court's holding was affirmed on appeal. "The appellate court held that Farris's statements — both before and after the Miranda warning — were voluntary and that once warned, he knowingly and intelligently waived hisMiranda rights. The court further held that the search of the vehicle's trunk was proper because Farris's `admissible *Page 7 
inculpatory statements relating to the drug paraphernalia gave the officer probable cause to search the trunk * * * pursuant to the automobile exception." A discretionary appeal followed.
 {¶ 15} The Ohio Supreme Court determined that Farris was in custody, for Miranda purposes, as he sat in the police cruiser, and that his postwarning statements were inadmissible because they were not the result of "an informed choice." In other words, the "midstream"Miranda warnings did not provide Farris with a genuine choice about whether to repeat an admission already given.
 {¶ 16} This case is distinguishable on its facts. As the State correctly notes, the trial court believed Olinger's testimony that heMirandized Foreman at the start of the interview, prior to any questioning. As noted above, the trial court is in the best position to resolve questions of fact and evaluate witness credibility, and we accept the trial court's factual findings, and rely on the trial court's ability to assess the credibility of all the witnesses. Since Olinger advised Foreman of his Miranda rights at the start of the interview, and not "midstream," Farris is not controlling, and we need not reach Foreman's arguments regarding the propriety of the "question-first scenario" he alleges. We note, while Foreman argues that Olinger's testimony alone is insufficient to prove that Foreman was timelyMirandized, and that the State should have substantiated the timing by recording or videotaping the interrogation, "[n]either the Ohio Constitution nor the United States Constitution requires that police interviews, or any ensuing confessions, be recorded by audio or video machines." State v. Smith (1977), 80 Ohio St.3d 89, 106, 684 N.E.2d 668.
 {¶ 17} Foreman further argues that his answer to question four was not *Page 8 
voluntarily given, since Olinger allegedly promised leniency and also lied to Foreman regarding the DNA evidence. "The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee that no person in any criminal case shall be compelled to be a witness against himself. The concern that animated the framers to adopt the Fifth Amendment was that coerced confessions are inherently untrustworthy. (Internal citation omitted). `A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt . . . but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape . . . that no credit ought to be given it.' (citation omitted).
 {¶ 18} "A suspect may waive his constitutional right against self-incrimination, provided that waiver is voluntary. A suspect's decision to waive his privilege against self-incrimination is made voluntary absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. (Internal citations omitted).
 {¶ 19} " * * * The due process clause continues to require an inquiry * * * concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession. (Internal citation omitted). This due process test takes into consideration the totality of all the surrounding facts and circumstances, including the characteristics of the accused and the details of the interrogation. * * * Factors to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements. * * *Page 9 
* If all of the attendant circumstances indicate that the confession was coerced or compelled, it cannot be used to convict the defendant. That determination depends upon a weighing of the pressure to confess against the power of resistance of the person confessing." State v.Jackson, Greene App. No. 02CA0001, 2002-Ohio-4680.
 {¶ 20} "Use of deceit by the interrogating police officers and misrepresentations made to the suspect about the evidence police possess do not per se render a confession involuntary. Rather, deceit or a misrepresentation about the evidence is but one factor bearing on voluntariness." State v. Reeves, Green App. No. 2002-CA-9, 2002-Ohio-4810; State v. Cooey, 46 Ohio St.3d 20, 27, 544 N.E.2d 895.
 {¶ 21} We initially note that Foreman, as a 53 year old high school graduate who has spent most of his adult life in prison, has significant prior criminal experience. The interview, having lasted less than an hour, with only Olinger present until the end, was neither overly long nor intense. There is no evidence of physical deprivation, mistreatment or threats. While Foreman argues that Olinger promised him leniency if he confessed, Olinger denied this, and the trial court found Olinger's testimony to be more credible than Foreman's, as discussed above. We note that, while Foreman testified that he "scratched out" his written answer to question four and wrote "yes" as a result of Olinger's promises of leniency, State's Exhibit 2 reveals only the answer "yes" next to question four and Foreman's initials. There is, however, an indecipherable scratched out response to question three, followed by the answer "no" and Foreman's initials.
 {¶ 22} Although Olinger testified that he lied to Foreman about the presence of DNA evidence, such deceit is only one factor to be considered in the totality of the *Page 10 
circumstances. It was significant to the trial court, as it is to us, that Foreman testified that he did not believe that the detectives had retrieved DNA matching his from the clothes of the victim. In other words, as the trial court noted, since Foreman knew that what Olinger said was untrue, Olinger's remark "didn't have an effect on his subsequent statement." Finally, we agree with the trial court that there was no evidence that Olinger's statement about the DNA sample overbore Foreman's will such as to make his confession involuntary. Clearly, Foreman was properly Mirandized and executed a knowing, intelligent, and voluntary waiver of his Fifth and Sixth Amendment rights, thus, the trial court properly overruled his motion to suppress. Judgment affirmed.
BROGAN, J. and FAIN, J., concur.
Copies mailed to:
R. Lynn Nothstine
Daniel J. O' Brien
 Hon. Jeffrey E. Froelich *Page 1