[Cite as *State v. Njideka*, 2020-Ohio-6644.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28713 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-3603 |
| | : | |
| SENYA BP OJI NJIDEKA | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of December, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

CHRISTOPHER C. GREEN, Atty. Reg. No. 0077072, 130 West Second Street, Suite 830, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Senya BP Oji Njideka ("Senya") appeals from a judgment of the Montgomery County Court of Common Pleas finding him guilty, on his guilty plea, of one count of having weapons while under disability, a felony of the third degree. The trial court imposed a sentence of 36 months, the maximum sentence, and Senya challenges this sentence herein. We hereby affirm the judgment of the trial court.

{¶ 2} On September 14, 2018, police responded to a report of domestic violence and found Senya with a firearm. On September 24, 2018, Senya was indicted on one count of felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree, with a repeat violent offender specification; one count of having weapons while under disability, in violation of R.C. 2923.13(A)(2); and one count of domestic violence, in violation of R.C. 2919.25(A), a misdemeanor of the first degree. Senya pled not guilty. On November 2, 2018, Senya filed a motion to suppress, which the trial court overruled in part and sustained in part on December 19, 2018.

{¶ 3} Senya entered his guilty plea to having weapons while under disability on May 16, 2019, in exchange for the dismissal of the remaining counts. Sentencing was set for January 9, 2020. At the beginning of the sentencing hearing, the following exchange occurred:

> THE COURT: * * * We are here today - - actually I think today a sentencing was set, but the record's going to reflect that the Court has received from the State of Ohio certain documents pertaining to applications for protection orders in this case, including the statement of [N.R.] back in 2016. This is out of Logan County, and then part of another hand-written statement similarly entered in this case.

The Court will note for the record that the content of the statement made by [N.R.] refer[s] to conduct allegedly had or done by the Defendant, specifically in relationship to [E.C.]

Now, just for purposes of the record, it is my understanding that by Skype, I have on the screen [N.R.].  Is that correct?

[N.R.]:  Yes.

THE COURT:  And I also have - - who else?  Can you state your name please?

[E.C.]: [E.C.]

THE COURT:  * * *

I believe, for purposes of the record, and in chambers prior, and subject to a supplemental to this statement, the Defense is objecting to the Court's conducting any type of interview/taking of a statement of either of these two ladies, and I understand the Defense position, particularly since these are not sworn statements.  These are not statements subject to cross-examination, and the Defense may present any other record you want to present.

* * *

THE COURT: * * * So [N.R.]?  Right?

[N.R.]: Yes.

THE COURT:  I have here your sworn CPO [civil protection order] statement that was made on June 8th, 2016.  * * * I'll just first ask you if you remember making that sworn statement?

[N.R.]:   Yes.   I made it to my attorney.

* * *

THE COURT:   * * * And was that part of a protection order request? Correct?

[N.R.]:   Yes.   Yes.

THE COURT: * * * And without going into detail of what you said in that statement, do you still stand by it?

[N.R.]:   Yes.

THE COURT: * * * Now, [E.C.], how old are you?

[E.C.]:   I am 20 years old.

* * *

THE COURT: * * * The statement made by [N.R.] addresses some conduct that is allegedly conduct by [Senya] pertaining to you.   Are you aware of the subject matter of what I'm talking about?

[E.C.]:   Yes.

THE COURT:   And have you talked with someone about this?

[E.C.]: Yes.   I went to a counselor.

THE COURT:   * * * So [E.C.], what I'm trying to do now is - - I'll tell you.   First of all, this isn't going to be an adversarial process where anybody's going to be cross-examining you about what you want to say. * * * But I want you to understand that I am considering what you say. That's why I've been trying for so long to get you to - - so that I can hear it. And in that regard, I'm going to give the floor to you in a minute, and I want

you to tell me the specifics of the conduct that gave you concern and perhaps even led you to seek counseling and the like.   Is that all right?

[E.C.]:   Yes, that's okay.

THE COURT: * * * And you - - you're not under oath, but you promise to be telling the truth here, correct?

[E.C.]: (Indiscernible)

THE COURT:   Okay.   And you're going to have to try to answer out loud when I ask you a question because we're making a record.   All right?

[E.C.]: Okay.

THE COURT:   * * * Now, what I would like you to do is just first tell me how it came to be that you were living in the same house as the Defendant, [Senya].

[E.C.]: Oh.   My mother was his girlfriend * * *

THE COURT:   And your mother is [A.R.-C.]?

[E.C.]:   Yes.

THE COURT:   And how old were you at the time that the incidents you're about to tell me about, took place?

[E.C.]:   I was 15 years old.

* * *

THE COURT: * * * And can you tell me what it is that you think I should be aware of, please?

[E.C.]:   I think you should be aware there are facts that I was put in a situation where the facts were I thought I was in grave danger.

THE COURT:   What was that situation?   And I know it's tough to talk about it, and I appreciate that, but you know, if I'm going to consider it, I need to hear it.

[E.C.]:   * * * My situation was that Senya would walk around the house naked, and he would insinuate certain things by his character, and he would try to coerce us to do things because he did move us out to (indiscernible) which is 14 hours away from my hometown that I've lived in my whole life, where my whole family is.   And there were threats of me never coming back to see my family if I didn't do what he wanted.

THE COURT:   And what was it, specifically, that he wanted you to do?

[E.C.]:   It was never specifically said but it was very much hinted at the fact that if I did not perform sexual acts, then I would not be able to come home and see my family.

THE COURT:   * * * did he ever request any - - I read something about removing a shirt.   Was there anything about that?

[E.C.]:   Yes.   He tried to get me to lift up my shirt in one conversation.

THE COURT: * * * And when you said insinuation and coercion were there times when he was naked in front of you?

[E.C.]:   Yes.   The majority of the time when at home.

THE COURT:   * * * And would he stand naked in front of you?

[E.C.]:   Yes.

THE COURT:   And how close would you be to him at that time?

[E.C.]:   There was one time where he was standing right next to me.

THE COURT: * * * And what was he doing at that one time?

[E.C.]:   Well, one time he said that he had some stuff that would be good for my skin, like my face because it was breaking out.

THE COURT:   Yes?

[E.C.]:   And he was applying it to my face and he was standing beside me naked.

THE COURT: * * * And were there any other incidents that come to mind where he was standing near you, naked and insinuating, as you just said earlier that there was some sort of insinuation or coercion towards sexual activity?   Tell me about that.

[E.C.]:   There was one time where we were getting ready for bed, like to go to bed for the night and there was a movie on, Fifty Shades of Grey, and he wanted us in the living room and watching it naked.

THE COURT: * * * Was there ever a discussion with you about how you could earn extra money?

[E.C.]:   Yes, that was a part of me coming back to Ohio to my family - - was I could get money if I did sexual things.

THE COURT:   Now, was that expressly stated to you or just implied?

[E.C.]:   It was expressed through a conversation that he said - - he gave me a metaphor that if women wanted to work up a system in a working

society, that they would perform sexual acts to get where they wanted to go, and then he stated that I wanted to go to Ohio, so he made the connection that if I wanted to go to Ohio, I would have to do those things.

* * *

THE COURT: * * * So I guess I'll just ask you, in general, what else, if anything else, would you like for me to know?

[E.C.]:  What I would like for you to know that at one point I had my cell phone taken away from me, my computer, any kind of contact that I would have had with my family was taken away.  And so to contact my family, we had to search (indiscernible) phone to call my nana and tell her about the situation.

THE COURT:  What situation?  Stuff you just - -

[E.C.]:  Yes, yes.  Because it had gotten to a point where I realized what was wrong and what was right, and I knew that I needed to get out of the situation.

THE COURT: * * * And then, did you get out of the situation?

[E.C.]:  Yes.  We found a flip phone and then we called my nana which then - -

THE COURT:  What's your nana - - what's your nana's name?

[E.C.]:  [N.R.].

THE COURT: * * * So that's her sitting next to you?

[N.R.]:  Yes, this is [N.].

**{¶ 4}**  N.R. then told the court that she received a phone call from E.C. in May

2015, in which E.C. described the situation at the house "as far as the nakedness * * * and that they were being asked to sit and watch a movie naked as well * * *."   N.R. stated that she and E.C. tried to figure out how they could communicate.    After their phone call, N.R. contacted E.C.'s school and sought protection orders.   At the time of Senya's sentencing hearing, E.C. had been living with N.R. since 2015.   N.R. told the court that E.C. was the oldest of three girls and that the behaviors described at the hearing had also affected her younger sisters, who were ages 6 and 17.   According to N.R., all three girls "were finally returned to Ohio," she (N.R.) "eventually regained full custody," and the three girls had been living with N.R. ever since.

{¶ 5} Defense counsel objected to the court's consideration of the unsworn statements by E.C. and N.R. when imposing sentence.   The State responded that the video statements were "similar to the types of sources * * * that can come up in a pre-sentence investigation."   The State asserted that Senya was "certainly aware that something was going on back in 2015," and he "knew something was going on" when the children were taken from New Hampshire back to Ohio.   The court continued the sentencing hearing.

{¶ 6} The sentencing hearing resumed on February 6, 2020, at which time the court indicated that it had reviewed the State's sentencing memorandum, the presentence investigation, "affidavits contained within a request for protection order," and a letter from Senya's ex-wife. The court stated:

THE COURT:   * * * So [Counsel for Senya], I think the first thing that I would like to address that you brought up has to do with, you know, we took these statements through skype of two people, one of whom lived in

his household, allegedly.   I don't think it's disputed she lived there; maybe what happened in the content [sic] is disputed.   And I think I told both of you that these are matters that did cause me concern.   However, I am of course, experienced enough to know that statements made like that, without the opportunity to have counsel cross-examine, that I should not perhaps give them the full consideration that I would give if they were made from a witness stand under oath.   I understand that.

That doesn't mean that I - - they hit me in a vacuum, * * *.   I do hear them. And I recognize that you understand and that everybody understands that I have the authority, basically, to impose what sentence I think is correct in this case.   And I think you both know this court[']s habits well enough that I struggle over some cases trying to decide, what is the right thing to do.   And I've been struggling on this case for about a year.

But there are other factors that concern this Court * * * that do not have anything to do with the statements made by the Skype. * * * I'm not asking you to comment on those.   You have not, but I presume you had the police reports in this case.   They are contained within the pre-sentence investigation.   And [A.R.-C.], who was the person involved in this case, made statements indicating that your client got angry asking where the f-ing gun was, that he grabbed her in a choke hold, that he struck her in the face 10 to 15 times, breaking one of her teeth.   An evidence crew was called to photograph those injures, and it's detailed that there is a broken right tooth along with discoloration.   So notwithstanding what I heard on

Skype, those facts concern me.

It also concerns me that [A. R.-C.] indicated that [Senya], at one point, held her at gunpoint and made her drink his piss. That's contained in here too. So when I - - if I throw out the Skype problem * * * I still have a problem with what's going on here.

So I have, in fact, considered the purposes and principals [sic] of sentencing, the seriousness and recidivism factors of the Ohio Revised Code, including the fact that I'm to use minimum sanctions to accomplish those purposes, without unnecessarily burdening the government accordingly. This is an F-3. I'm going to sentence [Senya] to 36 months incarceration at the Corrections Reception Center. * * *

{¶ 7} The court's February 10, 2020 judgment entry of conviction stated that the court had considered the sentencing factors set forth in R.C. 2929.11, R.C. 2929.12, and R.C. 2929.13.

{¶ 8} Senya asserts one assignment of error:

THE COURT ERRED WHEN IT IMPOSED THE MAXIMUM DEFINITE PRISON TERM FOR ONLY ONE OFFENSE.

{¶ 9} Senya asserts that the trial court erred "by not performing the statutory analysis required" by R.C. 2929.11 and 2929.12(B) when it imposed the maximum sentence allowable for having weapons while under disability. Senya asserts that, instead of "adhering to the statutory requirements," the court placed greater weight on the victim's statements related to events that happened at least five years earlier and were "wholly unrelated" to any events that occurred on September 14, 2018. Senya asserts

that, although courts are permitted to consider victim statements, they nonetheless have a duty to evaluate the factors outlined in R.C. 2929.11 and 2929.12. He also argues that nothing in the record reflects that the offense of having weapons while under disability was harmful to A.R.-C.

{¶ 10} As this Court has noted:

A "trial court has full discretion to impose any sentence within the authorized statutory range, and [it] is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences. *State v. King,* 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d. Dist.), citing *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus. Even so, the "court must comply with all applicable rules and statutes, including R.C. 2929.11 and R.C. 2929.12." *Id.*, citing *State v. Mathis,* 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 37.

Under R.C. 2929.11(A), a "court that sentences an offender for a felony shall be guided" by the "overriding purposes" of punishing the offender and "protect[ing] the public from future crime by the offender and others," while using "the minimum sanctions that [it] determines [likely to] accomplish [these] purposes without * * * unnecessar[ily] burden[ing] * * * state or local government resources." Accordingly, the court must "consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution." *See id.* R.C. 2929.11(B) adds that a felony sentence "shall be reasonably calculated to achieve the two overriding purposes of felony

sentencing, * * * commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon [any] victim[s], and consistent with sentences imposed for similar crimes committed by similar offenders."

Pursuant to R.C. 2929.12(A), in "exercising [its] discretion" to determine "the most effective way to comply with the purposes and principles of sentencing set forth in [R.C.] 2929.11," a court must consider, among other things, a list of nine factors "indicating that [an] offender's conduct [was] more serious than conduct normally constituting" the offense or offenses for which the offender was convicted; a list of four factors "indicating that the offender's conduct [was] less serious than conduct normally constituting the offense [or offenses]"; a list of five factors "indicating that the offender is likely to commit future crimes"; and another list of five factors "indicating that the offender is not likely to commit future crimes." The court "may [also] consider any other factors that are relevant to [fulfilling the] purposes and principles of [felony] sentencing." *Id.*; *see also* R.C. 2929.12(B)-(E).

On review of a felony sentence, an appellate court may vacate or modify the sentence "only if it determines by clear and convincing evidence that the record does not support the trial court's findings under the relevant statutes," or that the sentence "is otherwise contrary to law." *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.2d 1231, ¶ 1; *see also* R.C. 2953.08(G)(2). A sentence "is not contrary to law [if it falls] within the statutory range [and the trial court] expressly state[s] that it * * *

considered the purposes and principles of sentencing [under] R.C. 2929.11 [and] 2929.12." (Citation omitted.)  *State v. Rodeffer,* 2013-Ohio-5759, 5 N.E.3d 1069, ¶ 32 (2d Dist.).

*State v. Irwin-Debraux*, 2d Dist. Montgomery No. 28309, 2020-Ohio-5013, ¶ 16-19.

{¶ 11} The State directs our attention to *State v. Bowser*, 186 Ohio App.3d 162, 2010-Ohio-951, 926 N.E.3d 714, which states:

* * * [S]entencing statutes, for the most part, do not prescribe a specific sentence for a particular offense.  Rather, for each offense, the statutes generally give courts a range from within which to choose a sentence appropriate to the particular circumstances of the case.  The circumstances that a court considers encompass a broad range of information.

The practice of considering so much information before sentencing has deep historical roots in this country.   The United States Supreme Court has said that "both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law."   *Williams v. New York* (1949), 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337.   The evidence the court may consider is not confined to the evidence that strictly relates to the conviction offense because the court is no longer concerned, like it was during trial, with the narrow issue of guilt.   *See id.* at 246-247 * * *.   For

this reason, the sentencing process is "less exacting than the process of establishing guilt." *Nichols v. United States* (1994), 511 U.S. 738, 747, 114 S.Ct. 1921, 128 L.Ed.2d 745. The court's aim is to "impos[e] an appropriate sentence based upon the seriousness of the crime committed and the character of the defendant." *State v. Cassidy* (1984), 21 Ohio App.3d 100, 101, 21 OBR 107, 487 N.E.2d 322, citing *State v. Barker* (1978), 53 Ohio St.2d 135, 150-151, 7 O.O.3d 213, 372 N.E.2d 1324. Included in the circumstances of an offense, then, is the offender himself. Indeed, "a prevalent modern philosophy of penology," the Supreme Court has said, is "the punishment should fit the offender and not merely the crime." *Williams* at 247, 69 S.Ct. 1079, 93 L.Ed. 1337. The court continued, "Highly relevant—if not essential—to [the court's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." Id. Indeed, our Supreme Court has said that "the function of the sentencing court is to acquire a thorough grasp of the character and history of the defendant before it." *State v. Burton* (1977), 52 Ohio St.2d 21, 23, 6 O.O.3d 84, 368 N.E.2d 297.

To acquire this grasp, it is well established in Ohio law that the court may consider information beyond that strictly related to the conviction offense. For example, the statute governing the contents of a PSI report simply says, "[T]he officer making the report shall inquire into the circumstances of the offense and the criminal record, social history, and

present condition of the defendant." R.C. 2951.03(A). The statutory directive no doubt results in the sentencing court considering evidence that would be inadmissible at trial, *State v. Davis* (1978), 56 Ohio St.2d 51, 10 O.O.3d 87, 381 N.E.2d 641—like hearsay—and results in the court considering evidence entirely unrelated to the conviction offense. See *Gregg v. United States* (1969), 394 U.S. 489, 492, 89 S.Ct. 1134, 22 L.Ed.2d 442. So, the court may consider the offender's prior arrests, even if none yields prosecution. *Burton* at 23, 6 O.O.3d 84, 368 N.E.2d 297 ("it is well-established that a sentencing court may weigh such factors as arrests for other crimes"). The court may also consider facts that support a charge of which the offender is ultimately acquitted. *State v. Wiles* (1991), 59 Ohio St.3d 71, 78, 571 N.E.2d 97, quoting *United States v. Donelson* (C.A.D.C.1982), 695 F.2d 583, 590 (" 'It is well established that a sentencing judge may take into account facts introduced at trial relating to other charges, even ones of which the defendant has been acquitted' "). The court may even consider mere allegations of crimes for which the offender is never prosecuted. *State v. Cooey* (1989), 46 Ohio St.3d 20, 35, 544 N.E.2d 895 (allegations of uncharged criminal conduct found in a PSI report may be considered as part of the offender's social history).

And we have said that a sentencing court may consider a criminal charge and supporting facts that are dismissed under a plea agreement. In *State v. Blake* (June 11, 1999), Montgomery App. No. 17355, 1999 WL 375576, the offender had been originally charged with the violent offense of

aggravated robbery, accompanied by a firearm specification. But under a plea agreement, the prosecutor had dismissed the specification and the offender pleaded guilty to a reduced charge of robbery, a nonviolent offense. In sentencing the offender, however, the trial court clearly had believed the allegations supporting the original charge—that the offender used a gun to commit the robbery. Because of this belief, the court had imposed the maximum sentence.

*Bowser* at ¶ 13-16.

{¶ 12} We conclude that the trial court's maximum sentence for the single offense at issue in this case was not clearly and convincingly unsupported by the record or contrary to law. *See* R.C. 2929.14)(A)(3)(b). The record reflects that the court considered all relevant sentencing factors. The statements made by N.R. and E.C. were akin to information contained in Senya's PSI, and the court was free to consider them. Those statements reflected negatively on Senya's character. Of further significance to the court was the information contained in Senya's PSI. We have reviewed the PSI, and the trial court accurately represented its contents, namely that Senya's social history also included more recent incidents of violence involving a firearm with the victim herein. Finally, while Senya was convicted of only one offense, he was initially charged with two additional violent offenses, which were dismissed as part of a plea bargain. This offense was Senya's second felony as an adult.

{¶ 13} Since Senya's sentence was not clearly and convincingly unsupported by the record or contrary to law, his assignment of error is overruled.

{¶ 14} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Christopher C. Green
Hon. Richard Skelton